

**U.S. Department of Justice**

**United States Attorney's Office**
**Central District of California**

Suria M. Bahadue                          *1000 United States Courthouse*
*Assistant United States Attorney*        *312 North Spring Street*
*Criminal Appeals Section*                *Los Angeles, California 90012*
*suria.bahadue@usdoj.gov*                 *(213) 894-5487 (telephone)*

March 27, 2024

Molly Dwyer
Clerk of Court
U.S. Court of Appeals
(Via Ninth Circuit CM/ECF)

Re:     *United States v. James Vlha*, C.A No. 22-50281
        *United States v. Travis Schlotterbeck*, CA No. 22-50283
        (Cal.—Friday, March 29, 2024—Judges Gould, Ikuta, & Forrest)

Dear Ms. Dwyer:

The Government submits this letter under Federal Rule of
Appellate Procedure 28(j) to address *United States v. Perez-Garcia*, ---
F.4th ----, 2024 WL 1151665, at *10-18 (9th Cir. 2024), which held that
restricting pretrial releasees' gun access does not violate the Second
Amendment.

There, the Court first observed that the pretrial releasees, only
one of whom had a misdemeanor conviction, were part of "the people"
who have a right to keep and bear arms, but declined to reach the
question of whether felons are too. *Id.* at *8. Next, to assess the
historical tradition, the Court asked whether the modern regulation is
"relevantly similar" to historical laws and traditions, rejecting the
notion that *Bruen* uses different tests for different laws. *Id.* at *10-12;
*see* ARB-18-19.

Deploying that standard, the Court held that history supports
"disarming individuals who are not law-abiding, responsible citizens,"

including those "'judged to be a threat to the public safety'" and "'whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others.'" *Perez-Garcia*, 2024 WL 1151665, at *14, 16 (quoting *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barret, J., dissenting)). In doing so, the Court relied on many sources the government cited here. *Compare Perez-Garcia*, 2024 WL 1151665, at *14-16, *with* GAB-37-44.

Finally, the Court refused to "isolate each historical precursor and ask if it differs from the challenged regulation in some way." *Perez-Garcia*, 2024 WL 1151665, at *18. To not "miss[] the forest for the trees," it instead "examine[d] the historical evidence as a whole" for "a tradition of permissible regulation." *Id.* (reiterating that courts "must consult" a "'variety of legal and other sources'"). Under that approach, laws may be valid even "if the Government cannot identify a historical regulation under which [defendants], specifically, would have been disarmed." *Id.* at *14.

Additionally, the Eleventh Circuit, joining the Eighth and Tenth Circuits, held that following *Bruen*, 18 U.S.C. § 922(g)(1) is constitutional as applied to a nonviolent felon. *See United States v. Dubois*, 94 F.4th 1284, 1291-93 (11th Cir. 2024).

Very truly yours,

E. MARTIN ESTRADA
United States Attorney


 /s/ *Suria M. Bahadue*

SURIA M. BAHADUE
Assistant United States Attorney
Criminal Appeals Section

# *United States v. Perez-Garcia*,
## --- F.4th ---, 2024 WL 1151665
## (9th Cir. Mar. 18, 2024)

2024 WL 1151665
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Jesus PEREZ-GARCIA, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
John Thomas Fencl, Defendant-Appellant.

No. 22-50314, No. 22-50316
|
Argued and Submitted January 26,
2023 San Francisco, California
|
Filed March 18, 2024

**Synopsis**

**Background:** In case no. 3:21-cr-03101-JLS-1, defendant was charged with seven felony counts for unlawful possession of firearm. The United States District Court for the Southern District of California, Janis L. Sammartino, J., denied defendant's motion to modify order granting pretrial release pending bail, seeking elimination of condition prohibiting him from possessing firearms pending trial, 2022 WL 17486363, and he appealed. In case no. 3:22-CR-01581-GPC-2, different defendant was charged with two counts of importing controlled substances. The District Court, Gonzalo P. Curiel, J., denied defendant's motion to modify order granting pretrial release pending bail, which also sought elimination of condition prohibiting him from possessing firearms pending trial, 628 F.Supp.3d 1046, and he appealed. Appeals were consolidated. After Court of Appeals issued consolidated summary order, with opinion articulating reasons to follow, defendants filed motions to dismiss appeals as moot.

**Holdings:** The Court of Appeals, Sanchez, Circuit Judge, held that:

defendants' appeals from denial of motions to modify were not rendered moot by Court of Appeals' prior summary order and termination of pretrial release;

Bruen, and not United States v. Salerno, 107 S.Ct. 2095, which held that Bail Reform Act's provisions governing pretrial release did not violate Due Process and Excessive Bail Clauses, governed defendants' claim that condition of pretrial release prohibiting them from possessing firearm violated their Second Amendment right to bear arms as applied;

defendants were persons who were part of national community of "the people" who had right to bear arms under Second Amendment;

defendant's prior misdemeanor conviction or arrests did not categorically exclude him from national community of "the people" who had right to bear arms under Second Amendment;

Second Amendment presumptively protected proposed course of conduct of defendants on pretrial release pending criminal trials, i.e., to carry gun for protection of home, for self-defense, and to pursue employment as armed security officer; and

Bail Reform Act's condition of pretrial release prohibiting defendants from possessing firearm pending trial was consistent with United States' historical tradition of disarming criminal defendants facing serious charges while awaiting trial, and thus, condition did not violate Second Amendment right to bear arms as applied.

Affirmed; motions to dismiss appeals denied.

**Procedural Posture(s):** Appellate Review; Bail or Custody Motion.

Appeal from the United States District Court for the Southern District of California, Gonzalo P. Curiel, District Judge, Presiding, D.C. No. 3:22-cr-01581-GPC-2, Janis L. Sammartino, District Judge, Presiding, D.C. No. 3:21-cr-03101-JLS-1

**Attorneys and Law Firms**

Zachary Howe (argued), Daniel E. Zipp, and Patrick C. Swan, Assistant United States Attorneys, United States Attorney's Office, San Diego, California, for Plaintiff-Appellee.

Katherine M. Hurrelbrink (argued), Assistant Federal Public Defender, Federal Defenders of San Diego Inc., San Diego, California, for Defendant-Appellant.

Daniel L. Kaplan, Assistant Federal Public Defender; John M. Sands, Federal Public Defender, District of Arizona; Federal Public Defender's Office, Phoenix, Arizona; Carmen Smarandoiu, Appellate Chief; Jodi Linker, Federal Public Defender, Northern District of California; Federal Public Defender's Office, San Francisco, California; for Amici Curiae Ninth Circuit Federal Public and Community Defenders.

Ellora T. Israni and Ryan Downer, Civil Rights Corps, Washington, D.C., for Amicus Curiae Civil Rights Corps.

Adam Kraut, Second Amendment Foundation, Bellevue, Washington; Joseph G.S. Greenlee, FPC Action Foundation, Las Vegas, Nevada; C.D. Michel, Michel & Associates P.C., Long Beach, California; John W. Whitehead, The Rutherford Institute, Charlottesville, Virginia; for Amici Curiae Firearms Policy Coalition, FPC Action Foundation, Second Amendment Law Center, California Rifle & Pistol Association, Second Amendment Foundation, Rutherford Institute, and Cato Institute.

Before: Kim McLane Wardlaw, Richard R. Clifton, and Gabriel P. Sanchez, Circuit Judges.

## OPINION

SANCHEZ, Circuit Judge:

John Thomas Fencl was arrested after police officers found more than 110 guns in his house, including 10 unregistered and untraceable "ghost guns," 4 silencers, and 3 short-barreled rifles. Officers also uncovered thousands of rounds of ammunition, including armor-piercing and incendiary rounds and a tear-gas grenade. Jesus Perez-Garcia was arrested following a customs inspection at the United States-Mexico border. He was the passenger in a car in which officers found approximately eleven kilograms of methamphetamine and half a kilogram of fentanyl. Both men were charged with multiple felony offenses.

Consistent with the Bail Reform Act of 1984, two magistrate judges released Fencl and Perez-Garcia pending their trials but subjected them to a condition of pretrial release that temporarily barred them from possessing firearms pending trial. *See* 18 U.S.C § 3142 (c)(1)(B)(viii). The magistrate judges concluded that the firearm condition was the least restrictive way to assure the safety of the community and the

defendants' appearances in court. *Id.* § 3142(c)(1)(B). Two district court judges agreed.

In these consolidated appeals, Appellants Fencl and Perez-Garcia contend that the pretrial firearm condition violates their Second Amendment rights under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022). We disagree. We conclude that the Government has met its burden of showing that Appellants' temporary disarmament is consistent with our nation's historical tradition of firearm regulation. We previously affirmed the district courts' orders on that basis, *see* Order Dated January 26, 2023, and we now provide our full rationale.

## I.

**\*2** John Fencl was arrested in June 2021 after officers found more than 110 guns in his house. Discovered in the search were 10 "ghost guns," 4 silencers, 3 short-barreled rifles, and thousands of rounds of ammunition, including armor-piercing and incendiary rounds and a tear-gas grenade. This was not Fencl's first transgression for unlawful gun possession. He pleaded guilty to a misdemeanor firearm offense in 2019 after officers arrested him for unlawful possession of a concealed firearm without a license. He was arrested again in April 2021 for possession of a concealed firearm, a privately made ghost gun, while he was on probation. A few months after his June 2021 arrest, Fencl was charged with felony unlawful possession of three unlicensed short-barreled rifles and four unlicensed silencers in violation of 26 U.S.C. § 5861(d). If convicted on all seven counts, he faces up to 70 years in prison. *See id.* § 5871.

Fencl sought pretrial release, which the magistrate judge granted at a bond hearing. His release was subject to various conditions, including the following: "The defendant must not possess or attempt to possess a firearm, destructive device, or other dangerous weapon" and "must legally transfer all firearms, as directed by Pretrial Services." [1] The firearm condition effectively barred Fencl from possessing any firearms pending his trial. Shortly after the Supreme Court decided *Bruen*, Fencl filed a motion challenging the constitutionality of the firearm condition. He sought to remove the condition so that he could carry guns when he traveled out of state for work and to protect his home. The

magistrate judge denied his motion, and the district court affirmed.

In June 2022, Perez-Garcia was arrested following a customs inspection at the United States-Mexico border. He was the passenger in a car in which officers found approximately eleven kilograms of methamphetamine and half a kilogram of fentanyl. The Government charged him with two counts of importing controlled substances in violation of 21 U.S.C. §§ 952, 🚩 960. At his bond hearing, Perez-Garcia was granted pretrial release subject to various conditions, including a substantially similar firearm condition as the one imposed on Fencl. Shortly after 🚩 *Bruen* was issued, Perez-Garcia filed a motion to modify his conditions of pretrial release to remove the firearm condition. He wanted access to firearms so that he could pursue employment as an armed security officer and to protect his family. The magistrate judge denied his motion, and the district court affirmed.

These consolidated appeals followed. We have jurisdiction pursuant to 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291. We review *de novo* the constitutionality of pretrial release conditions under the Bail Reform Act. *See* 🚩 *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990). We may affirm the order on any ground supported by the record, even if it differs from the rationale of the district court. *See Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023).

## II.

Before reaching the merits of Appellants' claims, we address Appellants' motion to dismiss their consolidated appeals on the basis of mootness. The Government opposes the motion. We decline to dismiss the appeals for the reasons explained below.

In December 2022, Perez-Garcia and Fencl filed appeals of the denials of their respective motions to modify their conditions of pretrial release under Federal Rule of Appellate Procedure 9(a).[2] The parties fully briefed and argued the appeals in the following weeks. On January 26, 2023, we ruled against Fencl and Perez-Garcia in a consolidated, dispositive order stating, "We affirm the district court's orders. An opinion explaining this disposition will follow." It is not uncommon for appellate courts to resolve urgent motions by filing an expedited and summary order, later to be followed

by an opinion that provides the reasoning underlying the order. *See, e.g., Friends of the Inyo v. U.S. Forest Serv.*, No. 23-15492, 2023 WL 5541555, at *1 (9th Cir. Aug. 25, 2023) (issuing an order because "an immediate ruling is warranted" and noting that "[a]n opinion will follow in due course").[3]

**\*3** Fencl and Perez-Garcia moved to dismiss their appeals as moot after we ruled against them but before we provided our reasoning. In the time since we filed our dispositive order on January 26, 2023, Fencl was convicted at trial and Perez-Garcia's bond was revoked for repeatedly failing to appear for hearings.[4] Because neither Fencl nor Perez-Garcia remain on pretrial release, they contend that we now lack jurisdiction to explain our dispositive order because their challenges to their pretrial release conditions are moot.

We have explained that "[t]here is a significant difference between a request to dismiss a case or proceeding for mootness prior to the time an appellate court has rendered its decision on the merits and a request made after that time." 🚩 *Armster v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 806 F.2d 1347, 1355 (9th Cir. 1986). The former scenario implicates limitations on our constitutional power because Article III does not give federal courts constitutional authority to decide moot cases. *See* 🚩 *id.* But when mootness arises after a "valid decision" has already been rendered, "we are not precluded from exercising [A]rticle III power." 🚩 *Id.* Rather, we may exercise our discretion to determine whether the case should be dismissed based on equitable and pragmatic considerations. *See United States v. Payton*, 593 F.3d 881, 885 (9th Cir. 2010); 🚩 *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 590 F.3d 725, 728 (9th Cir. 2009).[5]

We deny Appellants' motion to dismiss for four reasons. First, the case is not moot, at least in the jurisdictional sense. We already heard and conclusively resolved the merits of Appellants' appeal in a dispositive order, and no party disputes that we had jurisdiction when we decided this case. An event occurring "after our decision had been rendered does not deprive this court of jurisdiction retroactively." *Dickens v. Ryan*, 744 F.3d 1147, 1148 (9th Cir. 2014) (en banc) (alterations adopted and internal quotation marks omitted); *see also Humphreys v. Drug Enf't Admin.*, 105 F.3d 112, 115 (3d Cir. 1996) (denying motion to dismiss appeal where the court "heard and determined the merits of the appeal" when "there was indisputably a live controversy between the parties").

Second, this opinion is not advisory because it addresses "properly presented questions concerning ... specific constitutional rights." *Armster*, 806 F.2d at 1355. By publishing the reasoning underlying our prior order, we merely explain the basis for our decision and do not take further action on the merits of Appellants' claims. We are not the only appellate court to follow this practice.

*See, e.g.*, *Romeu v. Cohen*, 265 F.3d 118, 122 (2d Cir. 2001) (explaining a prior order that denied a Puerto Rico resident's request for a New York absentee ballot even though the election took place months before the opinion issued); *United States v. Int'l Bhd. of Teamsters*, 955 F.2d 171, 174 (2d Cir. 1992) (publishing opinion promised in prior order despite termination of dispute following issuance of the order); *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 839 F.2d 1296, 1299–1301 & n.1 (8th Cir.) (explaining a prior order that permitted an election to proceed months after the election took place), *cert. denied*, 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988).

**\*4** The Second Circuit has explained that this appellate practice of bifurcating an expedited order with its reasoning is common, often necessary, and constitutional. *See Hassoun v. Searls*, 976 F.3d 121, 129 & n.4, 130 (2d Cir. 2020) ("Because the court's opinion explained its previous order—which addressed a live case or controversy—the opinion was not advisory."); *In re Grand Jury Investigation*, 399 F.3d 527, 528 n.1 (2d Cir. 2005). We agree. Our decision to publish this opinion to explain a prior order that fully adjudicated the merits of Appellants' claims does not render the opinion advisory. [6]

Third, equity weighs in favor of denying Appellants' motion. Were we to dismiss Appellants' appeals and not issue this opinion, we would deprive the legal community as a whole of "the benefit of an appellate court decision that adjudicated properly presented questions concerning ... specific constitutional rights." *Armster*, 806 F.2d at 1355; *accord Dickens*, 744 F.3d at 1148. That is especially true here since Appellants are challenging the common, statutorily authorized practice of imposing firearm restrictions as a condition of pretrial release.

We are also mindful that dismissal at this stage could incentivize parties to strategically prevent the publication of a decision adverse to their interests. Here, Appellants seek dismissal only "[a]fter seeing the proverbial writing on the wall" in our previously filed expedited order. *Naruto v. Slater*, 888 F.3d 418, 421 n.3 (9th Cir. 2018). Allowing parties to file appeals "seek[ing] the benefits of a favorable judicial decision"—and using considerable public resources in the process—only to later obtain dismissal to "escape some of the more significant adverse consequences of an unfavorable judgment," would not serve the interests of justice or judicial economy. *Armster*, 806 F.2d at 1356; *see also Albers v. Eli Lilly & Co.*, 354 F.3d 644, 646 (7th Cir. 2004) (per curiam) ("One good reason to exercise discretion against dismissal is to curtail strategic behavior.").

Fourth, and finally, dismissal would not be pragmatic because it would likely force later panels to duplicate our efforts while confronting the exact same issues. In light of the extensive and complicated historical analysis the Second Amendment now demands, cases involving Second Amendment challenges to temporary pretrial conditions could resolve before an appellate court has the opportunity to issue a thorough opinion. *See Bruen*, 597 U.S. at 111, 142 S.Ct. 2111 (Breyer, J., dissenting) (explaining how the difficulties attendant to extensive historical analysis are "especially acute" in the lower courts, which have fewer research resources, less assistance from *amici* historians, and higher caseloads). If we do not resolve this issue now, we might preclude efficient judicial review of a likely recurring constitutional challenge to application of the Bail Reform Act. *See Armster*, 806 F.2d at 1360; *Int'l Bhd. of Teamsters*, 955 F.2d at 174 (declining to dismiss appeal and publishing explanatory opinion in moot case because the issues presented were "of general and recurring applicability"). We decline to do so. We exercise our discretion to deny Appellants' opposed motion to dismiss their own appeals, and we proceed to the merits.

### III.

**\*5** The district courts' authority to impose conditions on Appellants' pretrial release stems from the Bail Reform Act of 1984. *See* 18 U.S.C. §§ 3141–3156. Congress passed that law to respond to "the alarming problem of crimes committed by persons on release." *United States v. Salerno*, 481 U.S. 739, 742, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (citation omitted). The purpose of the statute was to give courts

authority to make release decisions that recognize "the danger a person may pose to others if released." 🚩 *Id.* (citation omitted).

The Bail Reform Act authorizes federal courts to release defendants awaiting trial subject to specific conditions that "protect the community from the risk of crimes [they] might commit while on bail." 🚩 *United States v. Scott,* 450 F.3d 863, 874 (9th Cir. 2006). Courts have discretion to choose which conditions will best keep the community safe. 🚩 18 U.S.C. § 3142(c)(1)(B). [7] Some conditions necessary to keep the community safe nevertheless burden constitutional rights. For example, the Bail Reform Act explicitly authorizes release conditions that restrict a defendant's constitutional right to personal association, travel, speech directed at a victim or witness, or, at issue here, the possession of firearms. *See* 🚩 *id.* § 3142 (c)(1)(B)(i)-(xiv).

The Bail Reform Act balances the burdens imposed on criminal defendants' rights with safeguards designed to ensure that any restrictions imposed are narrowly tailored. Any condition imposed on a criminal defendant must be "the least restrictive" way to "reasonably assure the appearance of the person as required and the safety of any other person and the community." 🚩 *Id.* § 3142(c)(1)(B). And any such condition must be justified by showing that the defendant poses a "heightened risk of misbehaving while [released] on bail" pending trial. 🚩 *Scott,* 450 F.3d at 874. In sum, the Bail Reform Act offers pretrial detainees freedom pending trial in exchange for abiding by a number of conditions designed to protect the public and secure the attendance of the accused at trial. *See* 🚩 *id.* at 887-88 (Bybee, J., dissenting).

## IV.

Appellants contend that the Bail Reform Act's firearm condition violates their Second Amendment rights because it prohibits them from possessing guns while they are released pending trial. As we explain in more detail below, the Supreme Court recently clarified in 🚩 *Bruen* that the government bears the burden of showing that *any* regulation infringing on Second Amendment rights is consistent with this nation's historical tradition of firearm regulation. 🚩 597 U.S. at 17, 142 S.Ct. 2111. The Supreme Court specifically rejected the use of interest-balancing and means-end scrutiny and instead held that the Second Amendment's text, history, and tradition are the "[o]nly" avenues to justify a firearm regulation. 🚩 *Id.*

The Government argues that the Bail Reform Act's restriction on Appellants' firearm possession is justified not by the Second Amendment's text, history, or tradition, but by the Government's own "regulatory interest in community safety." In its view, the Supreme Court's decision in 🚩 *Salerno*— not 🚩 *Bruen*—controls and therefore forecloses Appellants' Second Amendment challenge. The Government's position, however, relies on a misreading of 🚩 *Salerno* and cannot be squared with 🚩 *Bruen.*

**\*6** In 🚩 *Salerno,* the Supreme Court concluded that the Bail Reform Act's provisions authorizing pretrial detention did not, on their face, violate the Constitution's Due Process and Excessive Bail Clauses. *See* 🚩 481 U.S. at 750-51, 755, 107 S.Ct. 2095. Consistent with the Court's due process jurisprudence, 🚩 *Salerno* rejected the due process challenge by balancing the accused's fundamental interest in liberty against the government's interest in preventing danger and flight. 🚩 *Id.* at 750-51, 107 S.Ct. 2095; *see also* 🚩 *id.* at 748, 107 S.Ct. 2095 ("We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest."). 🚩 *Salerno* then rejected the argument that the Eighth Amendment only allows the government to restrict bail solely based on the defendant's risk of flight. *See* 🚩 *id.* at 753-55. 🚩 *Salerno* "intimate[d] no view on the validity of any [other] aspects of the Act." 🚩 *Id.* at 745, n.3, 107 S.Ct. 2095.

The Government argues that because 🚩 *Salerno* already held that the Government's regulatory interest in community safety authorizes pretrial detention—which is a total deprivation of liberty—it follows that any lesser deprivations of liberty, such as the firearm pretrial release condition at issue here, must also pass constitutional muster if reasonably necessary to prevent danger to the community. Just as an indictment can justify restrictions on Fourth, Fifth, and Sixth Amendment rights, the Government contends, "then [it] can also justify

the restriction of a defendant's Second Amendment rights as a temporary and judicially authorized condition of pretrial release." As the Government sees it, 🚩*Bruen* did not alter the balance 🚩*Salerno* already struck nor require that courts accord Second Amendment rights special consideration. The Government invites us to "uphold the challenged condition without proceeding further" under a 🚩*Bruen* analysis.

The Government reads too much from 🚩*Salerno.* In upholding the Bail Reform Act's pretrial detention provisions from facial challenge on Fifth and Eighth Amendment grounds, the Supreme Court did not conclude nor imply that criminal defendants released pending trial lose their right to challenge the constitutionality of pretrial release conditions simply because detention might otherwise be permitted under an interest-balancing analysis. Nor does 🚩*Salerno*'s due process analysis impose a one-size-fits-all model of constitutional inquiry on all challenges to conditions of pretrial detention or release under the Bail Reform Act.

For example, when a criminal defendant in 🚩*Scott* challenged their pretrial release condition authorizing suspicionless searches or drug testing, we applied traditional Fourth Amendment analysis to assess whether these conditions were unreasonable searches or seizures. *See, e.g.,* 🚩*Scott*, 450 F.3d at 868-69. Similarly, when a class of pretrial detainees challenged a pretrial detention condition requiring them to expose their body cavities as a part of a strip search in 🚩*Bell*, the Supreme Court applied traditional Fourth Amendment analysis to these claims. *See* 🚩*Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In 🚩*Bell*, the Supreme Court also applied First Amendment analysis to a different claim involving a pretrial detention condition prohibiting detainees from receiving hardback books. *See* 🚩*id.* at 550, 99 S.Ct. 1861.

On the other hand, when a class of undocumented pretrial detainees raised a substantive due process challenge to an Arizona law that categorically forbade them from obtaining any form of bail or pretrial release, we applied 🚩*Salerno*'s interest-balancing substantive due process framework to assess whether the law comported with the Due Process Clause of the Fourteenth Amendment. *See* 🚩*Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014).

The point is that federal courts have not analyzed every constitutional challenge to a condition of pretrial detention or release under the Bail Reform Act by applying the same interest-balancing approach the Supreme Court applied in 🚩*Salerno.* We see no reason to apply the Government's one-size-fits-all approach here.

**\*7** After all, Appellants contend that the Bail Reform Act's firearm condition violates their Second Amendment rights, not their due process protection against punishment before conviction or their Eighth Amendment protection against excessive bail. And 🚩*Bruen* makes clear that text, history, and tradition are the "[o]nly" ways the 🚩Government can justify a regulation that implicates Second Amendment rights. 597 U.S. at 17, 142 S.Ct. 2111. We therefore analyze Appellants' Second Amendment challenges under the 🚩*Bruen* framework. Doing so does not elevate the Second Amendment above other constitutional rights. Rather, our approach "accords with how we protect other constitutional rights." 🚩*Id.* at 24, 142 S.Ct. 2111.

## V.

Fencl and Perez-Garcia challenge the Bail Reform Act's firearm condition as applied to them, which means they contend only that the law violates their Second Amendment rights based on the facts of their particular cases. *See* 🚩*In re Nat'l Sec. Letter*, 33 F.4th 1058, 1070 (9th Cir. 2022) (as amended). We therefore assess only whether the Bail Reform Act's firearm condition violates the Second Amendment as applied to Fencl and Perez-Garcia. *See* 🚩*United States v. Chovan*, 735 F.3d 1127, 1141 (9th Cir. 2013), *abrogated on other grounds by* 🚩*Bruen*, 597 U.S. at 17, 142 S.Ct. 2111.

The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 🚩*District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and 🚩*McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), the Supreme Court held that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for

self-defense. In *Bruen*, the Supreme Court recognized that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. 597 U.S. at 9-10, 142 S.Ct. 2111.

The Supreme Court has repeatedly emphasized, however, that "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626, 128 S.Ct. 2783; *see also Bruen*, 597 U.S. at 21, 142 S.Ct. 2111; *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020. The Court has recognized, for example, that legislatures may ban "dangerous and unusual weapons" because the Second Amendment does not guarantee an unlimited right to possess every kind of weapon. *Heller*, 554 U.S. at 627, 128 S.Ct. 2783. Similarly, legislatures may ban weapons in "sensitive places" because the Amendment does not guarantee an unlimited right to carry weapons in every kind of place. *Id.* at 626, 128 S.Ct. 2783; *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111.

So too may legislatures regulate who may possess weapons in the first place. In particular, the Court has recognized a historical tradition of disarming individuals who are not "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635, 128 S.Ct. 2783. To that end, *Heller* specifically identified "longstanding prohibitions on the possession of firearms by felons and the mentally ill" as non-exhaustive "examples" of "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26, 128 S.Ct. 2783. A plurality in *McDonald* similarly observed that the Second Amendment protects "the safety of ... law-abiding members of the community." 561 U.S. at 790, 130 S.Ct. 3020. And it "repeat[ed] [*Heller*'s] assurances" that the Second Amendment presumptively allows Congress to disarm those who are not law-abiding and responsible enough to have weapons, such as felons and individuals with mental illnesses. *Id.* at 786, 130 S.Ct. 3020.

In *Bruen*, the Supreme Court again reaffirmed *Heller*'s and *McDonald*'s holding that the Second Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home." *Bruen*, 597 U.S. at 9-10, 142 S.Ct. 2111. The *Bruen* court agreed with the plaintiffs in that case that "ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense." *Id.* At the same time, *Bruen* clarified that text, history, and tradition are the "[o]nly" avenues to justify a firearm regulation. *Id.* at 17, 142 S.Ct. 2111. The Supreme Court did so after we and other circuit courts—following *Heller* and *McDonald*—coalesced around a two-step framework for analyzing Second Amendment challenges that combined historical analysis with means-end scrutiny. *See, e.g.,* 🚩 *Young v. Hawaii*, 992 F.3d 765, 783-84 (9th Cir. 2021) (en banc), *vacated,* ––– U.S. ––––, 142 S. Ct. 2895, 213 L.Ed.2d 1108 (2022).

**\*8** *Bruen* rejected this two-step approach and adopted a two-step approach of its own. Rejecting the use of means-end scrutiny, the *Bruen* court instead instructed us to apply the following framework to Second Amendment claims: We first consider whether the Second Amendment's plain text covers an individual's proposed course of conduct. *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. If so, the Second Amendment presumptively protects that conduct. *Id.* The Government then bears the burden of justifying the challenged regulation by showing that it is consistent with our nation's "historical tradition of firearm regulation." *Id.* Only then may we conclude that the regulation is constitutional. With this framework in mind, we turn to Appellants' claims.

### A.

The threshold question in a Second Amendment claim is whether the Amendment presumptively protects the individual's conduct. *Id.* In *Bruen*, the Supreme Court approached this question by asking whether the petitioners were among "the people" within the plain meaning of the Second Amendment and then asking whether the plain text of the Amendment encompasses the individuals' "proposed course of conduct." *Id.* at 31-32, 142 S.Ct. 2111.[8]

In concluding that Fencl and Perez-Garcia are among the people who have Second Amendment rights, we pause to highlight a lingering ambiguity in the caselaw. The text of the Second Amendment refers to the right of "the people" to keep and bear arms. U.S. Const. amend. II. In *Heller*,

the Court interpreted the phrase "the people" to "refer[ ] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 554 U.S. at 580, 128 S.Ct. 2783 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990)). In other words, the Court presumed that "the people" refers to "all Americans." *Id.* at 581, 128 S.Ct. 2783. But when the Supreme Court specifically analyzed "limitation[s]" on the scope of the Second Amendment's protections, *id.* at 626-27, 128 S.Ct. 2783, *Heller* described the Second Amendment right as belonging to "law-abiding, responsible citizens," *id.* at 635, 128 S.Ct. 2783. *Bruen*, in turn, used the term "law-abiding, responsible citizens" and its variants more than a dozen times when describing the Second Amendment's scope. [9] The concurrences reiterated the same point. [10]

**\*9** As then-Judge Barrett explained while dissenting in *Kanter v. Barr*, some courts read the Supreme Court's Second Amendment caselaw to mean that there are certain groups of people—for example, violent felons or the mentally ill—"who fall entirely outside the Second Amendment's scope," meaning that they do not fall within even the plain text of the Amendment. 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by* *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111. [11] Other courts instead "maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right." *Id.* [12]

In Fencl's case, both the magistrate judge and the district court followed the first approach and held that Fencl is not a responsible, law-abiding citizen because he was "charged with unlawful possession of firearms based on a finding of probable cause." Under this view, Fencl "falls outside the scope" of the Second Amendment. Similarly, the magistrate judge in Perez-Garcia's case denied his request, in part, on the ground that he is not a law-abiding citizen because there is probable cause to believe that he committed a crime.

Although Appellants are pretrial releasees, they remain members of the national community—that is, they fall within the plain meaning of "the people"—and they are therefore not without the ability to invoke their constitutional right.

*See* *Heller*, 554 U.S. at 580, 128 S.Ct. 2783. The Bail Reform Act's firearm prohibition is a condition of pretrial release, so it only applies to those who have been charged but not yet convicted. While we recognize that well-founded criminal accusations can, pursuant to adequate procedural protections, result in *limitations* on individual rights, *see* *Salerno*, 481 U.S. at 747, 750-52, 107 S.Ct. 2095, it is quite another matter to say that a criminal defendant loses his or her ability to even challenge the condition itself under the Second Amendment. After all, even convicted persons serving their sentences enjoy freedoms of speech and religion under the First and Fourteenth Amendments, as well as equal protection and due process protection. *See* *Bell*, 441 U.S. at 545, 99 S.Ct. 1861. In our view, to allow the government to exclude an entire group of individuals from "the people" through mere accusation would be, at minimum, inconsistent with the presumption of innocence. *See* *Scott*, 450 F.3d at 874 ("Defendant is, after all, constitutionally presumed to be innocent pending trial, and innocence can only raise an inference of innocence, not of guilt.").

As to Fencl, specifically, we cannot conclude that his prior misdemeanor conviction or arrests should operate to categorically exclude him from the national community. While the Supreme Court has identified a longstanding tradition of prohibiting convicted *felons* from possessing guns, it has never suggested that felons are not among "the people" within the plain meaning of the Second Amendment, nor has it said anything at all about the rights of misdemeanants or arrestees. *See* *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by *felons*.' " (emphasis added) (quoting *Heller*, 554 U.S. at 626-27, 128 S.Ct. 2783)). We have already held that at least one group of misdemeanants—specifically, domestic violence misdemeanants—is "entitled to some measure of Second Amendment protection." *Chovan*, 735 F.3d at 1137 (citation omitted), *abrogated on other grounds by* *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111; *see also* *United States v. Chester*, 628 F.3d 673, 681 (4th Cir. 2010) (assuming that a domestic violence misdemeanant's "Second Amendment rights are intact"), *abrogated on other grounds by* *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111. We therefore conclude that Fencl and Perez-Garcia are among "the people"

within the meaning of the Second Amendment's "bare text."
*Bruen*, 597 U.S. at 44 n.11, 142 S.Ct. 2111.

**\*10** We next ask whether the Second Amendment presumptively protects Appellants' proposed course of conduct. It does. Fencl wanted to carry guns to protect his home and for self-defense when he traveled out of state for work. Perez-Garcia wanted to carry guns so that he could pursue employment as an armed security officer and protect his family. Their requests track the core constitutional right to possess a handgun for self-defense inside and outside the home, as defined by *Heller* and *Bruen*, respectively. *See Bruen*, 597 U.S. at 9-10, 142 S.Ct. 2111.

The Second Amendment may not protect Fencl's right to bear or keep "dangerous and unusual weapons," which might include ghost guns or silencers or armor-piercing ammunition. *Heller*, 554 U.S. at 627, 128 S.Ct. 2783 (citation omitted). *Heller* made clear—and *Bruen* affirmed—that the presumptive protections of the Second Amendment may be rebutted as to arms not " 'in common use' today for self-defense." *Bruen*, 597 U.S. at 32, 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 627, 128 S.Ct. 2783). But we need not decide this issue because the challenged condition restricts Fencl's ability to bear or keep *any* firearm—even those he would lawfully store at home for self-defense—and therefore unquestionably implicates his Second Amendment rights. Accordingly, we conclude that the Second Amendment presumptively protects Appellants' proposed course of conduct.

### B.

Because we conclude that the Second Amendment presumptively protects Appellants' proposed course of conduct while awaiting trial for their criminal charges, the Government bears the burden of proving that application of the Bail Reform Act's firearm condition to them is consistent with our nation's "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111.

At the second prong of the *Bruen* framework, the central question is whether the modern regulation is "relevantly similar" to historical laws and traditions, *id.* at 29,

142 S.Ct. 2111 (citation omitted), so as to "evince[ ] a comparable tradition of regulation," *id.* at 27, 142 S.Ct. 2111. *Bruen* emphasized that we must uphold a modern regulation if the government identifies a "well-established and representative historical analogue." *Id.* at 30, 142 S.Ct. 2111 (emphasis omitted). The government does not have to identify "a historical twin." *Id.* (emphasis omitted). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

The "central" consideration in this analysis is whether, when compared to a modern regulation, the historical precedent imposed a "comparable burden" on the right of armed self-defense and was "comparably justified." *Id.* at 29, 142 S.Ct. 2111 (emphasis omitted and citation omitted). In other words, both the modern regulation and the historical precedent must align as to "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Id.*

Here, the Government contends that the Bail Reform Act's firearm condition, as applied to Fencl and Perez-Garcia, is consistent with how and why our nation has historically disarmed criminal defendants facing serious charges while awaiting trial and, more generally, those who are not law-abiding, responsible citizens. We agree for the reasons provided below.

### 1.

We begin with how and why the Bail Reform Act's firearm condition burdens Appellants' Second Amendment rights. The firearm condition imposes a heavy burden on Appellants' rights to bear arms because it prohibits them from possessing or attempting to possess *any* firearm. On the other hand, the firearm condition is a temporary one, lasting only through the pendency of trial, *see* 18 U.S.C. § 3142(a), and the condition is imposed only upon individualized consideration by a judicial officer. *Id.* [13] So in *Bruen's* terms, "how" the regulation burdens Appellants' Second Amendment rights is through a complete, albeit temporary and individually tailored, prohibition on the right to bear arms.

**\*11** As to the "why," we can readily discern the purpose behind the firearm condition based on the plain text of the Bail Reform Act. The Act authorizes imposition of a firearm condition only if it is among the least restrictive ways to "reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(c)(1)(B). Public safety is the foremost consideration behind such a condition, but it is not difficult to imagine that risk of flight could also play a role in its imposition. *See* 🚩 *Salerno,* 481 U.S. at 753, 107 S.Ct. 2095. Having understood how and why the Bail Reform Act's firearm condition burdens Fencl's and Perez-Garcia's Second Amendment rights, we next move to the Government's proffered historical precedent.

2.

The Government first contends that application of the Bail Reform Act's firearm condition on Appellants is justified by our nation's history of disarming criminal defendants facing serious charges pending trial. Based on our historical review, we agree that our society has traditionally subjected criminal defendants to temporary restrictions on their liberty —including restrictions that affect their ability to keep and bear arms—to protect public safety and to ensure defendants' attendance at trial. As we explain below, the combination of separate but related founding era practices supports this conclusion: (1) most serious crimes were eligible for capital charges; (2) the government had the power to detain, and usually did detain, defendants indicted on capital charges; and (3) once detained, criminal defendants were completely disarmed. The Bail Reform Act's firearm condition as applied to Fencl and Perez-Garcia fits within this historical tradition of firearm regulation.

The goal of 🚩 *Bruen*'s analogical exercise is to use history to "delimit[ ] the outer bounds of the right to keep and bear arms." 🚩 597 U.S. at 19, 142 S.Ct. 2111. For that purpose, 🚩 *Bruen* explained, "not all history is created equal." 🚩 *Id.* at 34, 142 S.Ct. 2111. Emphasizing that the right codified in the Second Amendment was a "pre-existing right," the Court saw particular relevance in "English history dating from the late 1600s, along with American colonial views leading up to the founding." 🚩 *Id.* at 20, 142 S.Ct. 2111 (emphasis omitted) (quoting 🚩 *Heller,* 554 U.S. at 592, 128 S.Ct. 2783). The

🚩 *Bruen* court also found post-ratification practices from the late 18th and early 19th centuries as bearing on this question. *See* 🚩 *id.* at 35-36, 142 S.Ct. 2111. We focus on sources from those same historical time periods.

Since the Founding, the government has been empowered to detain criminal defendants while they await trial. *See* U.S. Const. amend. V (providing that a person may be "held to answer for a capital, or otherwise infamous crime ... on a presentment or indictment of a Grand Jury"); Act of Sep. 24, 1789, ch. XX § 33, 1 Stat. 73, 91 ("[F]or any crime or offence against the United States, the offender may ... be arrested, and imprisoned.").[14] Pretrial detention in the founding era involved total disarmament. As one 19th century state Supreme Court justice observed, "[p]ersons accused of a crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned." 🚩 *State v. Buzzard,* 4 Ark. 18, 21 (1842) (opinion of Ringo, C.J.); *see also* 🚩 *United States v. Rahimi,* 61 F.4th 443, 464 (5th Cir.) (Ho, J., concurring) ("Arrest and incarceration naturally entail the loss of a wide range of liberties—including the loss of access to weapons."), *cert. granted,* ––– U.S. ––––, 143 S. Ct. 2688, 216 L.Ed.2d 1255 (2023); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment,* 82 Mich. L. Rev. 204, 266 (1983) ("We may presume that persons confined in gaols awaiting trial on criminal charges were ... debarred from the possession of arms.").

**\*12** Not everyone facing criminal charges was subject to pretrial detention, to be sure. Bail, or pretrial release, also has deep historical roots. But pretrial release was far rarer in the founding era than it is today because the founding generation generally did not allow defendants facing capital charges to be released pending trial, and most serious criminal acts and felonies constituted capital offenses. The first Congress, for example, made bail available in all criminal cases "except where the punishment may be death." *See* Act of Sep. 24, 1789, ch. XX, § 33, 1 Stat. 73, 91. Many early state constitutions similarly provided an affirmative right to pretrial release except for those accused of "capital" crimes. *See, e.g.,* Pa. Const. ch. ii, § 28 (1776) ("All prisoners shall be bailable by sufficient sureties, unless for capital offences, when proof is evident, or presumption great."); N.C. Const. Art. XXXIX (1776); Vt. Const. ch. II, § 25 (1777); An Ordinance for the Government of the Territory of the United States Northwest of the River Ohio (1787) § 14, art. 2, 2 *Laws of the United*

*States of America* 559, 564 (1797); *cf.* 4 William Blackstone, *Commentaries* *294 ("[I]n felonies, and other offences of a capital nature, no bail can be a security equivalent to the actual custody of the person.").

As early state court decisions show, this practice continued after the Second Amendment was ratified. *See State v. Hill*, 1 Tread. 242, 246 (S.C. Const. App. 1812) (opinion of Smith, J.) ("The general rule is, not to admit to bail after bill found, in capital cases."); *People v. Tinder*, 19 Cal. 539, 539 (1862) ("An indictment for a capital offense furnishes of itself a presumption of the guilt of the defendant too great to entitle him to bail as matter of right under the Constitution, or as matter of discretion under the legislation of the State.").

Importantly, "capital crimes" in the founding era encompassed a broad set of offenses. Most serious crimes and felonies were eligible for capital charges because "death was the standard penalty for all serious crimes at the time of the founding." *Bucklew v. Precythe*, 587 U.S. 119, 139 S. Ct. 1112, 1122, 203 L.Ed.2d 521 (2019) (internal quotation marks omitted). In the pre-Revolutionary era, Blackstone explained the English practice this way: "[t]he idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." 4 William Blackstone, *Commentaries* *98.

The Founders shared a similar understanding. At the time of the Second Amendment's ratification, for example, nonviolent crimes such as forgery and horse theft were capital offenses. *See Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (citing Stuart Banner, *The Death Penalty: An American History* 23 (2002) (describing the escape attempts of men condemned to die for forgery and horse theft in Georgia between 1790 and 1805)). The First Congress imposed capital punishment for crimes such as "forgery of United States securities" and "running away with a ship or vessel, or any goods or merchandise to the value of fifty dollars." *Harmelin v. Michigan*, 501 U.S. 957, 980-81, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (opinion of Scalia, J.) (quoting An Act for the Punishment of Certain Crimes Against the United States, Chap. IX, § 8, 1 Stat. 112, 114 (1790)) (cleaned up). In sum, the historical record evinces a historical tradition of complete disarmament of criminal defendants facing serious or felony charges pending trial.

*Bruen* next requires us to consider whether our nation's history and tradition of disarming criminal defendants facing serious charges pending trial is "relevantly similar" to the Bail Reform Act's pretrial release firearm condition as applied to Appellants. *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111 (citation omitted). Again, both regulations must align as to "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Id.*

We conclude that the Bail Reform Act's pretrial release firearm condition as applied to Appellants is "relevantly similar" to the founding era tradition of disarming criminal defendants facing serious crimes so as to "evince[ ] a comparable tradition of regulation." *Id.* at 27, 29, 142 S.Ct. 2111 (citation omitted). First, the historical tradition of pretrial disarmament imposed "a comparable burden" on defendants' Second Amendment rights as the Bail Reform Act's firearm condition imposes on Appellants today. *Id.* at 29, 142 S.Ct. 2111. Both the modern restriction and its historical precursor allow for complete but temporary disarmament on a narrow subset of the population: criminal defendants awaiting trial for their alleged, serious crimes. Second, both the modern and historical regulations are "comparably justified." *Id.* Like the Bail Reform Act's firearm condition, the historical justifications for pretrial detention and disarmament have long included protecting the public from future criminal acts of the accused defendant. *Compare* A. Highmore, *A Digest of the Doctrine of Bail: In Civil and Criminal Cases*, vii (1783) (explaining that pretrial detention in the late 18th century ensured that "the safety of the people should be preserved against the lawless depredations of atrocious offenders"), *with Salerno*, 481 U.S. at 750, 107 S.Ct. 2095 (noting that the purpose of the Bail Reform Act was to respond to "the alarming problem of crimes committed by persons on release," and holding that the Government has a "compelling" and "heightened" interest in preventing crime and arrestees from presenting a "demonstrable danger to the community" (citation omitted)). Both the "how" and the "why" match.

**\*13** Appellants disagree. They do not dispute the well-established historical tradition of pretrial detention, nor that detained individuals accused of serious crimes were completely disarmed in the founding era. They argue instead that the "institution of pretrial detention" fails to provide the appropriate analogy here because they were granted pretrial

release. In their view, the Government must provide examples of pre-20th century "courts or legislatures restricting *pretrial releasees*' arms rights" and has failed to do so.

Appellants' arguments fail to persuade for two reasons. First, they assume that because they were granted pretrial release today, they would have been released pending their trials in the founding era. The historical evidence before us does not support that assumption. As we have explained, defendants in the founding era who faced serious charges were not released because those indicted on capital charges were not offered bail, and most felonies were capital offenses. *See Baze v. Rees,* 553 U.S. 35, 94, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (Thomas, J., concurring) (highlighting the "ubiquity of the death penalty in the founding era" and noting that it was "the standard penalty for all serious crimes" in the late 18th century (quoting Banner, *supra,* at 23)). Appellants have not pointed to any evidence in the historical record to rebut the Government's showing that criminal defendants facing capital or otherwise serious crimes were not eligible for pretrial release and were therefore detained and disarmed. *See Territory v. Benoit,* 1 Mart. (o.s.) 142, 142-43 (La.Terr.Super.Orleans 1810) ("Bail is never allowed in offences punishable by death, when the proof is evident or the presumption great.... We recollect no case in which it was done.").

Appellants undoubtedly were charged with serious crimes. Fencl was charged with seven felony counts, each punishable by up to ten years' imprisonment. *See* 26 U.S.C. § 5871. Perez-Garcia was charged with two felony counts of importing approximately eleven kilograms of methamphetamine and half a kilogram of fentanyl in violation of 21 U.S.C. §§ 952, 960. Each of those counts is punishable by up to ten years' imprisonment. *See* 21 U.S.C. § 960(b)(1). Felonies in the founding era "were—and remain—the most serious category of crime deemed by the legislature." *Medina,* 913 F.3d at 158. Because Appellants faced serious felony charges, the premise that they would have been released in the founding era is belied by the historical record. *See Tennessee v. Garner,* 471 U.S. 1, 13, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (explaining that in the founding era "virtually all felonies were punishable by death").

Today, of course, pretrial release is far more common. That is mainly because of successful reforms beginning in the 1960s that resulted in a dramatic decrease in the percentage of defendants detained before trial. *See* Timothy R. Schnacke et al., *The History of Bail and Pretrial Release,* Pretrial J. Inst. 11-16 (2010). [15] And we no longer subject people to capital punishment for, say, horse theft. *See Medina,* 913 F.3d at 158 (describing how penalties for many felony offenses became less severe in the decades following American independence). That Appellants are eligible for pretrial release today, however, does not undermine the historical evidence that similarly situated criminal defendants in the founding era would not have been released and would have instead been disarmed. As an initial matter, then, Appellants' reasoning fails on its own terms.

**\*14** Second, and more fundamentally, Appellants' mode of historical analysis rests on a flawed premise. They presume that if the Government cannot identify a historical regulation under which Perez-Garcia and Fencl, specifically, would have been disarmed pending pretrial release in the 18th century, then the Second Amendment forbids such regulation today. They are mistaken. The Second Amendment does not require the Government to identify an 18th century law that is a "dead ringer" for the modern pretrial release regime that materialized in the 1960s. *Bruen,* 597 U.S. at 30, 142 S.Ct. 2111. Rather, analogical reasoning under *Bruen* "requires only that the government identify a well-established and representative historical *analogue,* not a historical *twin.*" *Id.* (emphasis in original). Having established that the firearm condition as applied to Appellants is consistent with our nation's tradition of disarming criminal defendants charged with serious crimes pending trial, the Government need not go further and dig up an 18th century law under which Fencl and Perez-Garcia, specifically, would have been disarmed while awaiting trial for crimes like unlawful possession of unlicensed silencers or importing methamphetamine and fentanyl.

*Bruen* repeatedly made this point. For example, the Court surveyed the historical record and found "relatively few 18th-and 19th-century 'sensitive places' where weapons were altogether prohibited," like legislative assemblies, polling places, and courthouses. *Id.* But modern legislatures are not limited to regulating guns in *only* those sensitive places. Instead, the Second Amendment allows "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places." *Id.* (emphasis in original).

Similarly, the Supreme Court has maintained that the Second Amendment "presumptively" allows Congress to disarm persons convicted of felony offenses, *see Heller*, 554 U.S. at 626 & n.26, 128 S.Ct. 2783; *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020, even though the first federal law disarming felons dates to 1938, *see* Federal Firearms Act, Pub. L. 75-785, ch. 850, § 2(d)-(f ), 52 Stat. 1250, 1251 (1938). And while legislatures may prohibit "dangerous and unusual weapons," in applying that principle courts must analyze whether particular weapons are dangerous and unusual *today*, not whether they were widespread in the founding era. *See Bruen*, 597 U.S. at 47, 142 S.Ct. 2111 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today.").

The common-sense principle underscored by the Supreme Court is that the Constitution does not impose a "regulatory straightjacket" on our modern society. *Id.* at 30, 142 S.Ct. 2111. In this case, history shows that we have a tradition of disarming criminal defendants facing serious charges pending trial. The historical tradition of pretrial disarmament allows legislatures to disarm people who are facing serious charges *today*, regardless of whether laws disarming those same exact persons happened to exist in the founding era. The Government has proven that Fencl's and Perez-Garcia's temporary disarmament is justified by that historical tradition. That is all that the Second Amendment requires.

### 3.

The Government also contends that the Bail Reform Act's firearm condition is further justified by our nation's history of barring people or groups deemed dangerous or unlikely to respect the sovereign's authority from possessing firearms. Our review of the historical record similarly reveals a lengthy and extensive Anglo-American tradition of disarming individuals who are not law-abiding, responsible citizens. In particular, the historical record reflects that legislatures have long disarmed groups or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others. This historical tradition provides a separate ground in support of the Government's position.

As *Bruen* requires, we begin by analyzing the Government's proffered historical tradition. And because the Second Amendment "codified a right 'inherited from our English ancestors,' " we start in 17th century England. *Heller*, 554 U.S. at 599, 128 S.Ct. 2783 (citation omitted). Parliament first recognized a legal right to possess arms in the 1688-89 English Bill of Rights, which guaranteed rights to keep and bear arms "*as allowed by Law.*" An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crowne ("1688-89 English Bill of Rights"), 1 W. & M., Sess. 2, ch. 2, § 7, in 6 Statutes of the Realm 142-45 (Eng. 1688) (emphasis added). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Id.* While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones. It did not displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. Use of the Militia Act provisions allowing search and seizure of weapons from disaffected persons "continued unabated" after the adoption of the 1688-89 English Bill of Rights. *See* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019).

**\*15** Importantly, this English tradition of lawful disarmament coexisted with the fundamental right to keep and bear arms. Although the English Bill of Rights secured a right to possess arms, the government could—and did— disarm those who could not be trusted to use arms lawfully and responsibly. Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, 128 S.Ct. 2783, this background supports the view that the Second Amendment also empowers Congress to authorize the disarming of individuals who are not law-abiding, responsible citizens.

Similar laws and restrictions appeared in the American colonies, adapted to our own contemporary fears and perceived threats. For example, Catholics in the Maryland, Virginia, and Pennsylvania colonies were disarmed because of perceived disloyalty to the government and disrespect for the sovereign's laws. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).[16] As the Revolutionary War approached,

Connecticut, Massachusetts, Pennsylvania, New Jersey, Virginia, and North Carolina all enacted disarmament laws targeting the disloyal and those that could not be trusted to respect the sovereign's authority. *Id.* at 263-65. "The justification was always that those being disarmed were dangerous." *Id.* at 265; *see also* 🚩 *NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) ("American legislators had determined that permitting [those who refused to swear an oath of allegiance] to keep and bear arms posed a potential danger."), *abrogated by* 🔖 *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111.

Other early American laws, meanwhile, called for case-by-case judgments and disarmed individuals for particular types of conduct. Inspired by England's 1328 Statute of Northampton, Massachusetts Bay in 1692, New Hampshire in 1759, and Massachusetts in 1795 forbade carrying arms in an aggressive and terrifying manner. Greenlee, *supra*, at 262. For example, "[c]olonial Massachusetts and New Hampshire both authorized justices of the peace to arrest all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively ... by Night or by Day, in Fear or Affray of Their Majesties Liege People." *See* 🔖 *Bruen*, 597 U.S. at 47, 142 S.Ct. 2111 (quoting 1692 Mass. Acts and Laws no. 6, pp. 11-12 and 1699 N.H. Acts and Laws ch. 1). Similarly, "[a] 1736 Virginia legal manual allowed for confiscation of arms, providing that a constable 'may take away Arms from such who ride, or go, offensively armed, in Terror of the People' and may bring the person and their arms before a Justice of the Peace." Greenlee, *supra*, at 262 (quoting George Webb, *The Office of Authority of a Justice of Peace* 92-93 (1736)). A New Jersey law empowered officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess." Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90.

Precursors to the Second Amendment proposed in state ratifying conventions also suggest that the founding generation believed legislatures could disarm individuals deemed dangerous or unlikely to follow the sovereign's laws. At the Massachusetts ratifying convention, Samuel Adams, who opposed ratifying the Constitution without a declaration of rights, proposed providing that Congress may not "prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971) (emphasis added). "Adams's proposal was

celebrated by his supporters as ultimately becoming the Second Amendment." Greenlee, *supra*, at 266. "For example, an editorial in the *Boston Independent Chronicle* called for the paper to republish Adams's proposed amendments alongside Madison's proposed Bill of Rights, 'in order that they may be compared together,' to show that every one of Adams's intended alterations but one ... was adopted." *Id.* (alterations adopted) (quoting Editorial, *Boston Independent Chronicle*, Aug. 20, 1789, at 2, col. 2)).

**\*16** In Pennsylvania, Anti-Federalist delegates—who were adamant supporters of a declaration of fundamental rights—proposed that the people should have a right to bear arms "*unless for crimes committed, or real danger of public injury from individuals.*" Schwartz, *supra*, at 665 (emphasis added). As Justice Scalia noted in 🔖 *Heller*, this was a "highly influential" proposal. 🔖 554 U.S. at 604, 128 S.Ct. 2783. While neither proposal was adopted exactly as written, they reflect an expansive understanding in the founding era of the scope of legislatures' power to disarm, particularly among those who most strongly favored enshrining the right to armed self-defense in the Constitution.

Post-ratification practice points in the same direction. Antebellum commentators shared the founding generation's understanding of the Second Amendment's scope. John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably*, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he added, "to every one *who entitles himself by his demeanor* to the protection of his country." *Id.* (emphasis added). And a state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1.

As the Supreme Court explained in 🔖 *Bruen*, many states also enacted surety statutes in the mid-19th century requiring "those threatening to do harm" to "post bond before carrying weapons in public." 🔖 *Bruen*, 597 U.S. at 55, 142 S.Ct. 2111; *see, e.g.*, Mass. Rev. Stat. ch. 134, § 16, 750 (1836); Me. Rev. Stat. ch. 169, § 16, 709 (1840); Mich. Rev. Stat. ch. 162, § 16, 692 (1846). These statutes demonstrate that individuals who were "reasonably accused of intending to injure another or breach the peace" could properly be subject to moderate

firearm restrictions that did not apply to others. 🚩 *Bruen*, 597 U.S. at 57, 142 S.Ct. 2111.

In sum, the Anglo-American right to keep and bear arms for self-defense has always coexisted with legislative authority to disarm groups or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others. Or, as now-Justice Barrett put it, "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." 🚩 *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). [17]

We conclude that the Bail Reform Act's firearm condition as applied to Fencl and Perez-Garcia fits within the Government's proffered historical tradition of disarming people whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others. *See* 🚩 *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111.

 **\*17** First, the Bail Reform Act's firearm condition is a clear exercise of Congress' historical legislative power to disarm those who are "judged to be a threat to the public safety." 🚩 *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). As discussed, Congress passed the Bail Reform Act to respond to "the alarming problem of crimes committed by persons on release." 🚩 *Salerno*, 481 U.S. at 742, 107 S.Ct. 2095 (citation omitted). The purpose of the statute was to give courts authority to make release decisions that recognize "the danger a person may pose to others if released." 🚩 *Id.* (citation omitted). And the Act authorizes federal courts to release defendants awaiting trial subject to specific conditions that "protect the community from the risk of crimes [they] might commit while on bail." 🚩 *Scott*, 450 F.3d at 874. Moreover, the plain text of the Bail Reform Act provides that the firearm condition may be imposed only if it is among the least restrictive ways to "reasonably assure the appearance of the person as required and the safety of any other person and the community." 🚩 18 U.S.C. § 3142(c)(1)(B). The Bail Reform Act's firearm condition is thus specifically designed to disarm those whose possession of firearms would pose an unusual danger to the community.

Second, the Bail Reform Act's firearm condition does not broadly prevent law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms. *Cf.* 🚩 *Bruen*, 597 U.S. at 71, 142 S.Ct. 2111. It instead concerns only the rights of a narrow segment of the population arrested and charged with federal crimes. 18 U.S.C. § 3141(a)-(b). Congress today, like the founding era legislatures described above, retains the power to disarm narrow segments of the population whom it deems a threat to public safety. *See* 🚩 *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).

Relatedly and importantly, the firearm condition at issue here is individually tailored and applied only after consideration by a judicial officer. 🚩 18 U.S.C. § 3142(a). Local officials have long disarmed those whose conduct revealed their unfitness to access firearms. For example, many 18th century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous." *See, e.g.*, Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708). [18] Similarly, American justices of the peace have long been empowered to confiscate the arms of persons who carried them in a manner that spread fear or terror in the community. *See* Greenlee, *supra*, at 262 (collecting colonial era sources authorizing the confiscation of arms by local officials for reasons of public safety). Surety statutes also empowered local officials to temporarily disarm specific individuals who "threaten[ed] to do harm" or were "reasonably accused of intending to injure another or breach the peace." 🚩 *Bruen*, 597 U.S. at 55, 57, 142 S.Ct. 2111. In short, regulations that authorize disarmament only after individualized findings of dangerousness by public officials are within the heartland of legislative power to disarm those who are not law-abiding, responsible citizens.

The Government in this case acted in accordance with this historical tradition. The Government established an individualized need for applying the firearm condition against each Appellant in adversarial proceedings before two sets of neutral judicial officers. Those neutral judicial officers determined based on the evidence presented that Appellants posed a risk while on bail and that the firearm condition was the least restrictive way to assure the safety of the community as well as their appearances in court.

The record amply supports the judicial officers' decisions to temporarily disarm Appellants. As to Fencl, officers found more than 100 firearms in his house, including "ghost guns," thousands of rounds of ammunition, armor-piercing bullets, incendiary rounds, and even a tear-gas grenade. Fencl had

previously been convicted for unlawful possession of a concealed gun without a license and arrested for possession of a privately made ghost gun. The district court appropriately reviewed Fencl's stockpile and his propensity to violate gun laws and deemed him dangerous enough to temporarily bar him from possessing firearms pending his trial. As for Perez-Garcia, the district court found that the "nature of the charges and weight of the evidence supports a conclusion that Defendant is a danger to others" because he was apprehended in a vehicle containing approximately eleven kilograms of methamphetamine and half a kilogram of fentanyl when it arrived at the port of entry. The district court's "equation of [wide-scale] drug trafficking with dangerousness to the community" in this particular case has "a reasonable basis in common experience." *See United States v. Strong*, 775 F.2d 504, 508 (3d Cir. 1985) (as amended). By disarming both Fencl and Perez-Garcia after individualized findings of dangerousness, the Government acted consistent with its traditional regulatory authority.

**\*18** Finally, we note that the firearm condition only temporarily infringed on Fencl's and Perez-Garcia's right to keep and bear arms. Temporary disarmaments are well-precedented. Parliament, for example, allowed Catholics who "repeated and subscribed" to the necessary oath to rearm. 1 W. & M., Sess. 1, ch. 15, § 3, in 6 Statutes of the Realm 71-73 (Eng. 1688). Virginia gave Catholics the same choice. *See* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022). Nineteenth century surety statutes also show that individuals who were "reasonably accused of intending to injure another or breach the peace" could properly be subject to temporary firearm restrictions that did not apply to others. *Bruen*, 597 U.S. at 57, 142 S.Ct. 2111. Similarly here, both Fencl and Perez-Garcia were temporarily disarmed pending trial for their serious charges.

Appellants reject the Government's proffered historical tradition. They note that the "loyalty oath" statutes were primarily adopted at the height of the American Revolution and argue that "[r]egulations limited to times of 'turmoil' and 'rebellion' shed little light on the Second Amendment." They find the affray statutes prohibiting bearing arms in a way that spreads fear or terror in the community inapt because those statutes did not encroach on the right to keep arms at home. And they claim the surety statutes "were too few and too late to constitute a founding-era 'tradition.' "

Appellants' divide-and-conquer approach to the historical evidence misses the forest for the trees. In applying the Second Amendment, we do not isolate each historical precursor and ask if it differs from the challenged regulation in some way. We emphasize again: *Bruen* does not require the Government to identify a "historical twin" or an 18th century "dead ringer" for the Bail Reform Act's firearm condition. 597 U.S. at 30, 142 S.Ct. 2111 (emphasis omitted). We instead examine the historical evidence as a whole, determining whether it establishes a tradition of permissible regulation (such as "dangerous and unusual weapons" or "sensitive places"), and whether the historical precedent and the modern regulation are "relevantly similar," *Bruen*, 597 U.S. at 27, 142 S.Ct. 2111 (citation omitted), so as to "evince[ ] a comparable tradition of regulation," *id.* at 29, 142 S.Ct. 2111.

Moreover, although traditional firearm regulations are an important form of historical evidence, they are not the only one. In assessing the Second Amendment's original meaning, we must consult "a variety of legal and other sources," *Heller*, 554 U.S. at 605, 128 S.Ct. 2783, including English history, *id.* at 598-600, 128 S.Ct. 2783; analogous provisions in state constitutions, *id.* at 600-03, 128 S.Ct. 2783; Second Amendment precursors, *id.* at 604-05, 128 S.Ct. 2783; commentary, *id.* at 605-10, 616-19, 128 S.Ct. 2783; case law, *id.* at 610-14, 128 S.Ct. 2783; and legislative debates, *id.* at 614-16, 128 S.Ct. 2783.

Here, the historical evidence, when considered as a whole, shows a long and broad history of legislatures exercising authority to disarm people whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others. *See* *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). The temporary disarmament of Fencl and Perez-Garcia as a means reasonably necessary to protect public safety falls within that historical tradition.

\* \* \*

We therefore hold that the Bail Reform Act's firearm condition on pretrial release is constitutional as applied to Fencl and Perez-Garcia. Our holding is consistent with how we have long balanced the constitutional rights of pretrial

detainees and releasees with legitimate public safety and logistical considerations. *See, e.g.,* 🚩 *Bell,* 551 U.S. at 546-48, 127 S.Ct. 2588 (upholding restrictions on the First, Fifth, and Fourteenth Amendment rights of a class of pretrial detainees); 🚩 *Albright v. Oliver,* 510 U.S. 266, 278, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring) (noting that a pretrial releasee must "seek formal permission from the court ... before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction"). And our holding is consistent with our nation's long history

of temporarily disarming criminal defendants facing serious charges and those deemed dangerous or unwilling to follow the law.

**\*19** As held in our order dated January 26, 2023, we **AFFIRM.** Appellants' motion to dismiss these appeals is **DENIED.**

### All Citations

--- F.4th ----, 2024 WL 1151665

---

## Footnotes

1   The magistrate judge modified the firearm condition to prohibit Fencl from possessing gun parts as well.

2   Federal Rule of Appellate Procedure 9(a) requires the courts of appeals to "promptly determine" such appeals, and they were referred to a motions panel of the court.

3   *See also* *Where Do We Go Berkeley v. Cal. Dep't of Transp.,* No. 21-16790, 2022 WL 1196712, at *1 (9th Cir. Apr. 19, 2022); *United States v. Gainza,* 827 F. App'x 730 (9th Cir. 2020); *All. for Wild Rockies v. Cottrell,* 385 F. App'x 683, 684 (9th Cir. 2010); *Santiago v. Rumsfeld,* 403 F.3d 702, 702 (9th Cir. 2005).

4   Fencl's case went to trial and he was convicted on October 27, 2023. Perez-Garcia failed to appear for district court hearings on February 21, 2023, and March 6, 2023. As a result, the district court issued an arrest warrant and granted the Government's oral motion to revoke his bond. Perez-Garcia's bond was forfeited in May 2023.

5   Appellants' motion to dismiss the appeal as moot is effectively a motion to vacate a prior decision issued while there was a live case or controversy. *See* 🚩 *Armster,* 806 F.2d at 1355. When Appellants filed their motions to dismiss, we had already issued our order on January 26, 2023, which conclusively resolved the merits of their pending appeals. Appellants do not dispute that this court had jurisdiction when we issued that "valid decision." 🚩 *Id.* Were we to dismiss this case as moot now, we would in effect be "vacat[ing] a decision we have already issued." *See* 🚩 *id.*

6   Appellants contend that our decision in 🚩 *Environmental Protection Information Center, Inc. v. Pacific Lumber Co.,* 257 F.3d 1071 (9th Cir. 2001), requires us to dismiss their appeals as moot. We do not find that case controlling. In that case, Pacific Lumber Company asked us to vacate statements made by the district court in its opinion granting Pacific Lumber's motion to dismiss the case as moot in which the district court outlined reasons for previously granting a preliminary injunction against Pacific Lumber. 🚩 *Id.* at 1073. The question before us was whether Pacific Lumber was an "aggrieved" party with standing to request an appellate court to vacate statements made by the lower court after it had rendered judgment in Pacific Lumber's favor. 🚩 *Id.* We answered in the affirmative and remanded to the lower court to vacate its statements on the merits made after it entered judgment dismissing the case as moot. 🚩 *Id.* at 1077. We said nothing about an appellate

court's discretionary authority after rendering a decision on the merits but before a mandate issues. *See* 🚩 *Armster*, 806 F.2d at 1355.

7    To determine which conditions should be imposed, the Bail Reform Act directs a judicial officer to consider the following: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 🚩 18 U.S.C. § 3142(g)(1)-(4).

8    The Supreme Court in 🚩 *Bruen* did not specify which party carries the burden to demonstrate whether the Second Amendment presumptively protects the proposed course of conduct of the party invoking the Second Amendment's protections. We need not decide that issue here because our conclusion that the Second Amendment presumptively protects Fencl and Perez-Garcia's proposed course of conduct would stand regardless of which party in this case carried the burden on this issue.

9    *See* 🚩 *Bruen*, 597 U.S. at 15, 142 S.Ct. 2111 ("law-abiding, adult citizens"); 🚩 *id.* at 26, 142 S.Ct. 2111 ("law-abiding, responsible citizens") (quotation omitted); 🚩 *id.* at 29, 142 S.Ct. 2111 ("a law-abiding citizen's right to armed self-defense"); 🚩 *id.* at 30, 142 S.Ct. 2111 ("law-abiding citizens"); 🚩 *id.* at 31, 142 S.Ct. 2111 ("ordinary, law-abiding, adult citizens"); 🚩 *id.* at 33, n.8, 142 S.Ct. 2111 ("law-abiding citizens"); 🚩 *id.* at 38, 142 S.Ct. 2111 ("law-abiding citizens"); 🚩 *id.* at 38, n.9, 142 S.Ct. 2111 ("law-abiding, responsible citizens" and "ordinary citizens") (quotations omitted); 🚩 *id.* at 57, 142 S.Ct. 2111 ("the responsible") (quotation omitted); 🚩 *id.* at 59, 142 S.Ct. 2111 ("responsible arms carrying"); 🚩 *id.* at 60, 142 S.Ct. 2111 ("law-abiding citizens"); 🚩 *id.* at 70, 142 S.Ct. 2111 ("law-abiding, responsible citizens"); 🚩 *id.* at 71, 142 S.Ct. 2111 ("law-abiding citizens").

10   *See* 🚩 *Bruen*, 597 U.S. at 72, 142 S.Ct. 2111 (Alito, J., concurring) ("law-abiding residents"); 🚩 *id.* at 74, 142 S.Ct. 2111 ("law-abiding citizens" and "[o]rdinary citizens"); 🚩 *id.* at 75, 142 S.Ct. 2111 ("law-abiding person"); 🚩 *id.* at 76, 142 S.Ct. 2111 ("right of law-abiding people," "law-abiding New Yorker," and "ordinary person"); 🚩 *id.* at 78, 142 S.Ct. 2111 ("ordinary law-abiding Americans"); 🚩 *id.* at 79, 142 S.Ct. 2111 (Kavanaugh, J., concurring) ("ordinary, law-abiding citizens") (quotation omitted).

11   *See, e.g.,* 🚩 *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) ("On balance, the historical evidence and the Supreme Court's discussion of felon disarmament laws leads us to reject the argument that non-dangerous felons have a right to bear arms."); 🚩 *Binderup v. Att'y Gen.*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he Founders understood that not everyone possessed Second Amendment rights. These appeals require us to decide who count among 'the people' entitled to keep and bear arms."), *abrogated on other grounds by* 🚩 *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111.

12   *See, e.g.,* 🚩 *United States v. Rahimi*, 61 F.4th 443, 451-53 (5th Cir.), *cert. granted*, ––– U.S. –––, 143 S. Ct. 2688, 216 L.Ed.2d 1255 (2023); 🚩 *Range v. Att'y Gen.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc) ("[W]e reject the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment.").

13    Appellants dispute that the Bail Reform Act's firearm condition is narrowly applied in the Southern District of California at large. They claim that judges in the district "virtually never strike the condition" and say their "review of over 150 release orders identified just one, a Social Security fraud misdemeanor, without the condition." But Appellants contend only that the firearm condition is unconstitutional as applied to *them* and therefore seek only a modification of *their* pretrial release conditions. We do not take up the question whether the firearm condition may theoretically be applied to others because "[a]n as-applied challenge does not implicate the enforcement of the law against third parties." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). And Appellants do not dispute that their firearm conditions were imposed only after individualized review.

14    Indeed, detention pending trial, in the basic form it exists today, dates to the Assize of Clarendon issued by King Henry II in 1166. *See generally* William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33, 44-45 (1977).

15    *See also* John S. Goldkamp, *Danger and Detention: A Second Generation of Bail Reform*, 76 J. Crim. L. & Criminology 1, 12 (1985). In 1962, for example, only about half of felony defendants across 20 cities secured pretrial release; by 1971, the percentage had risen to two-thirds. *See* Wayne H. Thomas, *Bail Reform in America* 32, 37-38 (1976).

16    "Virginia exempted from disarmament anyone willing to take an oath of allegiance to King George III," and its disarmament excepted "necessary weapons ... for the defence of ... house or person." Greenlee, *supra*, at 263 (citation omitted).

17    To the extent that "courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868," we note that post-Civil War practice reinforced this historical understanding. *Bruen*, 597 U.S. at 37, 142 S.Ct. 2111. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," but that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866). The Freedman's Bureau issued a circular around the same time that explained that a person "may be disarmed if convicted of making an improper or dangerous use of weapons." *Bruen*, 597 U.S. at 63, 142 S.Ct. 2111 (quotation omitted).

18    *See also* Giles Jacob, *The Modern Justice* 338 (2d ed. 1717); W. Nelson, *The Office and Authority of a Justice of Peace* 9-10 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (1719); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward Officer* 231 (6th ed. 1756).

---

**End of Document**               © 2024 Thomson Reuters. No claim to original U.S. Government Works.

*United States v. Dubois,*
94 F.4th 1284 (11th Cir. 2024)

94 F.4th 1284
United States Court of Appeals, Eleventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Andre Michael DUBOIS, A.K.A. Larry Davis,
A.K.A. Andre Dubois, Defendant-Appellant.

No. 22-10829
|
Filed: 03/05/2024

**Synopsis**

**Background:** Defendant was convicted in the United States District Court for the Northern District of Georgia, No. 1:20-cr-00305-WMR-JKL-1, William M. Ray, II, J., of attempting to smuggle firearms out of the United States, delivering firearms to a common carrier for shipment without written notice, and possessing a firearm as a felon, and was sentenced to an enhanced, below-guideline prison sentence of 110 months and a low-end fine of $25,000. Defendant appealed conviction and sentence.

**Holdings:** The Court of Appeals, William Pryor, Chief Judge, held that:

sufficient evidence supported finding that defendant knew that the box he attempted to ship contained a firearm;

as a matter of first impression, a drug regulated by state law is a "controlled substance" for state predicate offenses, even if federal law does not regulate that drug;

as a matter of first impression, Court would consult Georgia law, rather than federal law, to determine whether substance that defendant trafficked was a "controlled substance" for purposes of sentence enhancement under the sentencing guidelines;

as a matter of first impression, under the categorical approach, defendant's prior marijuana-trafficking conviction under Georgia law was a "controlled substance offense" under sentencing guidelines;

as a matter of first impression, term "controlled substance," within meaning of definition of controlled substance offense in sentencing guidelines, means a substance regulated by state

law when the defendant was convicted of the prior state drug offense;

plain error review applied to challenge to imposition of fine; and

district court did not plainly err in imposing fine.

Affirmed.

Rosenbaum, Circuit Judge, filed concurring opinion in which Abudu, Circuit Judge, joined.

**Procedural Posture(s):** Appellate Review; Sentencing or Penalty Phase Motion or Objection.

**\*1288** Appeal from the United States District Court for the Northern District of Georgia, D.C. Docket No. 1:20-cr-00305-WMR-JKL-1

**Attorneys and Law Firms**

Ryan Karim Buchanan, Gabriel Adam Mendel, Lawrence R. Sommerfeld, U.S. Attorney Service-Northern District of Georgia, DOJ-USAO, Northern District of Georgia, Atlanta, GA, Natasha S. Cooper, Office of the U.S. Trustee, Atlanta, GA, for Plaintiff-Appellee.

Nicole Kaplan, W. Matthew Dodge, Stephanie A. Kearns, Federal Defender Program, Atlanta, GA, for Defendant-Appellant.

Before William Pryor, Chief Judge, and Rosenbaum and Abudu, Circuit Judges.

**Opinion**

William Pryor, Chief Judge:

This appeal by Andre Dubois, a federal prisoner, of his convictions and sentence for three federal firearm offenses requires us to answer five questions. First, did *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L.Ed.2d 387 (2022), which held that the Second Amendment protects a right to bear arms outside the home, abrogate our precedent upholding the felon-in-possession ban? *See* 18 U.S.C. § 922(g)(1); *United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010). Second, was there sufficient evidence from which a reasonable jury could find that Dubois knew that he possessed a firearm?

Third, is Dubois's Georgia marijuana conviction a "controlled substance offense" under the Sentencing Guidelines? *See* United States Sentencing Guidelines Manual § 2K2.1(a)(4)(A) (Nov. 2021). Fourth, does our precedent interpreting the guidelines' stolen-gun enhancement, *see id.* § 2K2.1(b)(4)(A), violate due process or intervening Supreme Court precedent? And fifth, did the district court plainly err by sentencing Dubois to pay a $25,000 fine without explanation? Because our precedent forecloses Dubois's challenges to the felon-in-possession statute and the stolen-gun enhancement; the evidence could permit a reasonable jury to convict him on all counts; his marijuana conviction is a controlled substance offense; and unchallenged evidence proves that he can afford his fine, we affirm Dubois's convictions and sentence.

# I. BACKGROUND

In 2018, Andre Dubois entered an Express Copy Print & Ship store in Suwanee, Georgia, and attempted to ship a box containing firearms to the Commonwealth of Dominica. Federal officials seized the shipment and charged Dubois with three counts: attempting to smuggle firearms out of the United States, *see* 18 U.S.C. § 554; delivering firearms to a common carrier for shipment without written notice, *see id.* § 922(e); and possessing a firearm as a felon, *see id.* § 922(g)(1). The only factual dispute at trial was whether Dubois knew that the box he tried to ship contained firearms —an element of all three charges. Dubois stipulated that he was the customer who delivered the package and that he knew that he was a felon when he did so.

At trial, the prosecution presented evidence that on April 23, 2018, a car parked outside the ship store. Dubois exited the passenger side and walked into the store carrying a large, sealed box on his shoulder. Jeffrey Morris was working the front desk. Morris asked Dubois to state his **\*1289** name, phone number, and return address; the recipient's name, phone number, and shipping address; and the contents of the package. Dubois said that his name was "Larry Davis" and provided a Georgia return address and New York phone number. He said that the recipient's name was "Monette Paul" and provided a Dominica shipping address and phone number. And he said that the package contained two frying pans.

Dubois behaved strangely during the transaction. Dubois read some of the information that he gave Morris from a piece of paper that he had pulled from his pocket. And he made or

took three phone calls during his brief exchange with Morris to "double check" the information he provided. When Morris tried to verify the return address using the store's online database, it came back as an "unknown" address. Because this notification sometimes appeared for new addresses not yet programmed in the database, Morris asked Dubois whether his address was new. Dubois replied, "it's a newer address." Morris testified that he asked Dubois twice whether the information that he provided was accurate, and both times Dubois said that it was. Morris also specifically asked Dubois whether, "if [he] opened the box, there would be two frying pans in it." Dubois replied, "yes." And on the customer invoice—which Dubois signed "Larry Davis"— Dubois certified that his shipment complied with federal law, that the information he provided was "true and correct," and that "the contents of th[e] shipment [we]re as stated" on the invoice. Dubois paid for the shipment in cash before exiting the store.

Federal officials seized the package after a carrier employee identified a suspicious object during an x-ray screen. Officials discovered a loaded revolver, two disassembled pistols, and over 400 bullets, all wrapped in aluminum foil and hidden in two individually packaged deep fryers. According to an investigator, firearm smugglers often try to evade detection by packaging firearms in this manner.

An investigation into the shipper's identity revealed that the information Dubois gave Morris was false. Agents began their investigation by looking for "Larry Davis," the listed sender, but they could not find anyone with that name associated with the listed address or phone number. Nor could agents locate "Monette Paul," the listed recipient. Finally, using the ship store's surveillance footage, agents identified Dubois as the shipper by tracing the logo on the shipper's sweatshirt to Dubois's former employer. An agent testified that "every shipper" he has encountered "who has attempted or successfully made an illegal export from the United States ... provided false information on the shipping documents."

At the close of the prosecution's case, Dubois moved for acquittal on all counts. *See* FED. R. CRIM. P. 29(a). He argued that all three counts failed as a matter of law because the prosecution failed to introduce sufficient evidence that Dubois knew that the package that he attempted to ship contained firearms. And he argued that his section 922(g)(1) charge was unconstitutional because nonviolent felons maintain a Second Amendment right to possess firearms—

though he acknowledged that "existing precedent" foreclosed this argument. The district court denied Dubois's motion, and the jury convicted him on all counts.

A probation officer prepared a presentence investigation report recommending an imprisonment range of 130 to 162 months and a fine range of $25,000 to $250,000 under the Sentencing Guidelines. The officer assigned Dubois a base offense level of 20 after concluding that Dubois's 2013 Georgia conviction for possession **\*1290** with intent to distribute marijuana was a "controlled substance offense."

*See* ⚑ U.S.S.G. §§ 2K2.1(a)(4)(A), ⚑ 4B1.2(b). And the officer applied a two-level enhancement because one of the firearms that Dubois possessed had been reported as stolen.

*See* ⚑ *id.* § 2K2.1(b)(4)(A).

The presentence investigation report also described Dubois's "[f]inancial [c]ondition" and his "[a]bility to [p]ay" a fine. The report stated that the probation officer had requested "signed authorization forms and financial documents" from Dubois, but Dubois never provided this information. So the probation officer obtained Dubois's financial information by consulting public records, Dubois's bond report, and Dubois's pretrial services record. The officer calculated Dubois's net worth as exceeding $54,000 by subtracting his student loan debt and unpaid court fines from the value of a condo that he had inherited from his mother. And the officer found that Dubois had a monthly income exceeding $3,000. Last, the probation officer determined that Dubois was "able-bodied and could work while in custody to make minimal payments towards any fine the Court orders." Based on this information, the officer concluded that Dubois "ha[d] the ability to pay a fine within the fine guideline range" of $25,000 to $250,000.

Dubois objected to three parts of the presentence investigation report. First, he objected to the description of his offense conduct on the ground that "he is not guilty of the offense charged" because "the government did not prove that he knew what was in the box." Second, Dubois objected to the probation officer's application of an enhanced base offense level of 20 because his Georgia marijuana conviction does not qualify as a categorical controlled substance offense under the guidelines. Last, he objected to the stolen-gun enhancement on the ground that applying it "on a strict liability basis" violates due process and that its accompanying commentary "impermissibly expands" the guideline beyond its plain text. Dubois did not object to the probation officer's recommended fine range or to the finding that Dubois could afford a fine

within that range. And aside from the description of his offense conduct, Dubois did not object to any of the factual findings in the report.

The district court overruled Dubois's objections and, on March 1, 2022, sentenced Dubois to a below-guideline prison sentence of 110 months and a low-end fine of $25,000. It did not provide reasoning for the fine amount during the sentencing hearing, but Dubois's counsel made no specific objection to the amount or to Dubois's ability to pay it. His counsel made only a general objection: "I'll object to the sentence as procedurally and substantively unreasonable and also object to the substantive reasonableness specifically of both the sentence and the fine."

Dubois appealed his convictions and sentence. While his appeal was pending, but before the parties filed their briefs, the Supreme Court decided in ⚑ *Bruen* that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." ⚑ 142 S. Ct. at 2122. Dubois later moved to stay his appeal pending two decisions. *See United States v. Rahimi*, No. 22-915 (U.S. argued Nov. 7, 2023); *Jackson v. United States*, No. 22-6640 (U.S. argued Nov. 27, 2023). We denied his motion to stay and his motion for reconsideration.

## II. STANDARDS OF REVIEW

We review *de novo* a challenge to the sufficiency of the evidence, "viewing the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility determinations in the government's favor." ⚑ **\*1291** *United States v. Green*, 981 F.3d 945, 960 (11th Cir. 2020). We will affirm the jury's verdict so long as "any reasonable construction of the evidence could have allowed the jury to find 'the essential elements of the crime' beyond a reasonable doubt." *United States v. Colston*, 4 F.4th 1179, 1190 (11th Cir. 2021) (quoting ⚑ *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We also review *de novo* the interpretation and constitutionality of the Sentencing Guidelines. ⚑ *United States v. Amedeo*, 370 F.3d 1305, 1312 (11th Cir. 2004) (interpretation); ⚑ *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015) (constitutionality). And we review *de novo* the denial of a motion for a judgment of acquittal. ⚑ *United States v.*

*Seher*, 562 F.3d 1344, 1364 (11th Cir. 2009). We review for plain error an unpreserved challenge to a criminal fine. *See* *United States v. Hernandez*, 160 F.3d 661, 665 (11th Cir. 1998).

### III. DISCUSSION

We proceed in five parts. First, we explain that our precedent forecloses Dubois's argument that section 922(g)(1) violates the Second Amendment. Second, we explain that sufficient evidence supports the jury's finding that Dubois knew that he possessed a firearm. Third, we explain that Dubois's state marijuana conviction is a "controlled substance offense" under the Sentencing Guidelines. Fourth, we explain that the application of the stolen-gun enhancement on a strict-liability basis complies with due process and Supreme Court precedent. Fifth, we explain that the imposition of a $25,000 fine was not plain error.

### A. Our Precedent Bars Dubois's Second Amendment Challenge.

Dubois challenges the denial of his motion for a judgment of acquittal on the felon-in-possession charge. *See* 18 U.S.C. § 922(g)(1). Dubois does not dispute that his conduct falls squarely within the felon offense: he possessed firearms and ammunition after sustaining a felony conviction for drug trafficking. He instead argues that the statute violates his right to bear arms under the Second Amendment. Dubois concedes that Circuit precedent bars his challenge; we upheld section 922(g)(1) under the Second Amendment in *Rozier*, 598 F.3d at 770–71. But Dubois argues that *Bruen* abrogated *Rozier* and requires us to vacate his conviction. We disagree.

In *District of Columbia v. Heller*, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court sustained a Second Amendment challenge to a District of Columbia law that prohibited private possession of handguns. The Court adopted an approach "bas[ed] o[n] both text and history" for analyzing gun restrictions and ruled the prohibition unconstitutional. *Id.* at 595, 128 S.Ct. 2783. It held that law-abiding citizens have a Second Amendment right to possess handguns in the home for self-defense. *Id.* at 635–36, 128 S.Ct. 2783.

*Heller* cautioned that the Second Amendment right "is not unlimited." *Id.* at 626, 128 S.Ct. 2783. Importantly, the Court stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* The Court labeled these federal regulations "presumptively lawful." *Id.* at 627 n.26, 128 S.Ct. 2783. And it explained that the Second Amendment guarantees a right to "law-abiding, responsible citizens" who "use arms in defense of hearth and home." *See* *id.* at 635, 128 S.Ct. 2783.

Two years after *Heller*, we rejected a challenge to section 922(g)(1) in *Rozier*. Like Dubois, Rozier possessed a firearm and ammunition after having been convicted of a felony drug crime. 598 F.3d at 769 & n.1. He challenged his conviction on the ground that section 922(g)(1) violates the **\*1292** Second Amendment. *Id.* at 770. We disagreed because, under *Heller*, "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." *Id.* at 771. "[T]he first question" under *Heller*, we explained, "is whether one is *qualified* to possess a firearm." *Id.* at 770. And felons are unqualified as "a class" because they are not "law-abiding citizen[s]." *Id.* at 771. *Heller* "made this clear" by labeling the felon-in-possession ban " 'a presumptively lawful longstanding tradition.' " *Id.* (quoting *United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010)); *accord* *McDonald v. City of Chicago*, 561 U.S. 742, 786, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality opinion) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' .... We repeat those assurances here." (quoting *Heller*, 554 U.S. at 626–27, 128 S.Ct. 2783)). And we said that this language from *Heller* was "not dicta" because it limited the Second Amendment right to

"*law-abiding* and *qualified* individuals." 🚩*Rozier*, 598 F.3d at 771 n.6.

After 🚩*Heller* and 🚩*Rozier* came 🚩*Bruen*, which involved a challenge to New York's gun-licensing regime. 142 S. Ct. at 2122. New York prohibited law-abiding citizens from obtaining a license to carry outside the home unless they first proved "a special need for self-defense." *Id.* The Court ruled the scheme unconstitutional because "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.*

🚩*Bruen* began its analysis by rejecting, as inconsistent with 🚩*Heller*, the second part of a two-step test that then prevailed in most circuits. *See* 🚩*id.* at 2125–30. Under that test, a court would first ask whether the challenged law burdened conduct that falls within the scope of the Second Amendment, "as historically understood." *See, e.g.*, 🚩*United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). If it did, the court would review the regulation under either intermediate or strict scrutiny. *See* 🚩*id.* We embraced this two-part framework in dicta beginning in 2012, *see* 🚩*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012), but we have never actually applied the second, means-end-scrutiny step, *see* 🚩*United States v. Jimenez-Shilon*, 34 F.4th 1042, 1052–53 (11th Cir. 2022) (Newsom, J., concurring).

🚩*Bruen* approved "[s]tep one of the predominant framework" as "broadly consistent with 🚩*Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." 🚩142 S. Ct. at 2127. But 🚩*Bruen* rejected the second, "means-end scrutiny" step as incompatible with 🚩*Heller*, which "expressly rejected" applying a "judge-empowering interest-balancing inquiry" to analyze Second Amendment challenges. 🚩*Id.* at 2127, 2129 (internal quotation marks omitted) (quoting 🚩*Heller*, 554 U.S. at 634, 128 S.Ct. 2783). 🚩*Bruen* then reiterated that "🚩*Heller*'s text-and-history standard" is the correct test

for determining the constitutionality of gun restrictions. *See* 🚩*id.* at 2138.

The Supreme Court left no doubt that it viewed its decision as a faithful application of 🚩*Heller*, not a departure from it. *See, e.g.*, 🚩*id.* at 2122 (stating that its holding is "consistent with 🚩*Heller*"); 🚩*id.* at 2131 (stating that its test "[f]ollow[s] the course charted by 🚩*Heller*"); 🚩*id.* (stating that "[t]he test that [the Court] set forth in 🚩*Heller*" is the same one that courts must "apply today"). That approval of 🚩*Heller* included the recognition that the Second Amendment is "subject to certain reasonable, well-defined restrictions." 🚩*Id.* at 2156 (citing 🚩*Heller*, 554 U.S. at 581, 128 S.Ct. 2783). Although the Court did not mention felon-in-possession **\*1293** bans, it confirmed that 🚩*Heller* correctly "relied on the historical understanding of the Amendment to demark the limits on the exercise of that right." 🚩*Id.* at 2128. And 🚩*Bruen*, like 🚩*Heller*, repeatedly described the right as extending only to "law-abiding, responsible citizens." *See, e.g.*, 🚩*id.* at 2131 (quoting 🚩*Heller*, 554 U.S. at 635, 128 S.Ct. 2783).

To determine whether 🚩*Bruen* abrogates 🚩*Rozier*, we apply our prior-panel-precedent rule: " ' 'a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*.' " *In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015) (quoting 🚩*United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008)). An intervening Supreme Court decision abrogates our precedent only if the intervening decision is both "clearly on point" and "clearly contrary to" our earlier decision. 🚩*Edwards v. U.S. Att'y Gen.*, 56 F.4th 951, 965 (11th Cir. 2022) (emphasis omitted) (citation and internal quotation marks omitted). If the Supreme Court "never discussed" our precedent and did not "otherwise comment[ ] on" the precise issue before the prior panel, our precedent remains binding. *See* 🚩*United States v. Vega-Castillo*, 540 F.3d 1235, 1238–39 (11th Cir. 2008). To abrogate a prior-panel precedent, "the later Supreme Court decision must 'demolish' and 'eviscerate' each of its 'fundamental props.' " *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir.

2022) (alterations adopted) (citation omitted), *cert. denied*, *Del Castillo v. Ladapo*, ––– U.S. ––––, 143 S. Ct. 486, 214 L.Ed.2d 277 (2022). So, for example, if our precedent relied on "a line of Supreme Court precedents that the [Supreme] Court itself emphasizes in a later decision is not implicated by that later decision," the Supreme Court's intervening decision "cannot have" abrogated our precedent. *Id.*

*Bruen* did not abrogate *Rozier*. Because the Supreme Court "made it clear in *Heller* that [its] holding did not cast doubt" on felon-in-possession prohibitions, *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020 (plurality opinion), and because the Court made it clear in *Bruen* that its holding was "[i]n keeping with *Heller*," 142 S. Ct. at 2126, *Bruen* could not have clearly abrogated our precedent upholding section 922(g)(1). *See Del Castillo*, 26 F.4th at 1223–25. Indeed, the *Bruen* majority did not mention felons or section 922(g)(1). *See Vega-Castillo*, 540 F.3d at 1238–39.

Dubois argues that we may depart from *Rozier* because *Bruen* abrogated "[a]ll prior precedent relying on the two-step analysis." But *Rozier* upheld section 922(g)(1) on the threshold ground that felons are categorically "disqualified" from exercising their Second Amendment right under *Heller*. *Rozier*, 598 F.3d at 770–71 (quoting *Heller*, 554 U.S. at 635, 128 S.Ct. 2783). We interpreted *Heller* as limiting the right to "law-abiding and qualified individuals" and as clearly excluding felons from those categories by referring to felon-in-possession bans as presumptively lawful. *Id.* at 771 & n.6. And far from "demolish[ing]" or "eviscerat[ing]" *Rozier*'s reliance on *Heller*, *see Del Castillo*, 26 F.4th at 1224, *Bruen* repeatedly stated that its decision was faithful to *Heller*. We require clearer instruction from the Supreme Court before we may reconsider the constitutionality of section 922(g)(1). Because *Rozier* binds us, Dubois's challenge based on the Second Amendment necessarily fails.

*B. Sufficient Evidence Supported the Verdict.*

Dubois also argues that the district court erred by denying his motion for a judgment of acquittal on all counts because there was insufficient evidence that **\*1294** he knew that the box he attempted to ship contained a firearm. We disagree. Viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found beyond a reasonable doubt that Dubois knew that the box contained firearms. *See Colston*, 4 F.4th at 1189–90.

Although there is no direct evidence that Dubois knew that the box contained firearms, the prosecution may and often does prove knowledge using circumstantial evidence. *Id.* at 1190 ("Guilty knowledge can rarely be established directly."). And there is ample circumstantial evidence that allowed a reasonable jury to find that Dubois knew that firearms were in the box. For example, there is substantial evidence that Dubois tried to make the illicit shipment untraceable to either himself or the intended recipient—efforts that would be inexplicable if Dubois did not know that the box contained illegal contraband. In particular, the jury heard that Dubois gave Morris fake names, addresses, and phone numbers for both himself and the recipient; that Dubois falsely certified that this information was accurate; and that he paid for the transaction in cash. *See United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977) (stating that "concealment, assumption of a false name, and related conduct[ ]" may be evidence of guilt (citation omitted)). The parties also stipulated at trial that Dubois knew that he was a felon when he possessed the box. Dubois's felon status provides a plausible motivation for his lying about the shipment and supports an inference that he knew the box contained firearms or ammunition as opposed to some other contraband. Dubois also knew some of the contents of the package: he told Morris that the box contained "two frying pans," and the box in fact contained "two deep fryers" in addition to the firearms and ammunition. That Dubois knew some of the contents of the box supports an inference that he knew the remaining contents as well. And by delivering the box to the ship store, Dubois "was instrumental to [the] ... success" of the criminal plan—another circumstantial "guidepost[ ]" by which we have said a jury may infer knowledge. *Colston*, 4 F.4th at 1190.

We accept Dubois's argument that the evidence also supports an inference that he was being directed by someone else to mail the package: someone else drove Dubois to the ship store; Dubois read some of the shipping information that he

relayed to Morris from a piece of paper; and Dubois made or took three phone calls during the brief transaction to confirm that information. But that inference is consistent with the inference that Dubois too knew the package contained a gun. *See id.* ("[I]f a defendant ... was in frequent contact with someone who knew th[e critical] fact, then a jury may be able to infer knowledge."). This "reasonable construction of the evidence" allowed the jury to find that the prosecution proved Dubois's knowledge beyond a reasonable doubt. *See id.*

### C. Dubois's Georgia Marijuana Conviction is a "Controlled Substance Offense" Under the Sentencing Guidelines.

Next, Dubois argues that we should vacate his sentence because his 2013 conviction for possession with intent to distribute marijuana is not a predicate "controlled substance offense" under the Sentencing Guidelines. Although Dubois's base offense level for his firearm convictions would ordinarily be 14, *see* U.S.S.G. § 2K2.1(a)(6), the guidelines assign a base offense level of 20 if the defendant "committed any part of the instant offense subsequent to sustaining" a felony conviction for a "crime of violence or a controlled substance offense," *id.* § 2K2.1(a)(4)(A). The guidelines define a "controlled substance offense" as "an offense under federal or state law, punishable by imprisonment for a term exceeding **\*1295** one year, that prohibits ... the possession of a controlled substance ... with intent to manufacture, import, export, distribute, or dispense." *Id.* § 4B1.2(b); *see* id. § 2K2.1, cmt. n.1 (" 'Controlled substance offense' has the meaning given that term in [ section] 4B1.2(b)."). The district court enhanced Dubois's base offense level under the guidelines based on his 2013 Georgia conviction for possession with intent to distribute marijuana. *See* GA. CODE § 16-13-30(j)(1) (2013).

To determine whether a state conviction qualifies as a controlled substance offense under the guidelines, we apply the "categorical approach." *Hollis v. United States, 958 F.3d 1120, 1123 (11th Cir. 2020).* This approach requires us to compare the guideline definition of "controlled substance offense" with the state statute of conviction. *United States v. Lange, 862 F.3d 1290, 1293 (11th Cir. 2017), abrogated on other grounds by United States v. Dupree, 57 F.4th 1269 (11th Cir. 2023)* (en banc). Unless "the least culpable conduct prohibited under the state law ... qualif[ies] as a

predicate [controlled substance] offense," the defendant's state conviction cannot be the basis of an enhancement under the guidelines, regardless of the actual conduct underlying the conviction. *See* United States v. Laines, 69 F.4th 1221, 1233 (11th Cir. 2023).

Dubois argues that his Georgia conviction for possession with intent to distribute marijuana does not qualify him for base-level enhancement because his statute of conviction is categorically broader than the guideline definition of "controlled substance offense." He explains that at the time of his conviction in 2013, both Georgia and federal law defined "marijuana" to include hemp. *See* GA. CODE § 16-13-21(16) (2011); 21 U.S.C. § 802(16) (2009). But by the time he was sentenced for his federal offenses in 2022, both definitions had been amended to exclude hemp. *See* GA. CODE § 16-13-21(16) (2019); 21 U.S.C. § 802(16)(B)(i) (2018). Because the law at the time of his state conviction was broader than the law at the time of his federal sentencing, he maintains that the state conviction is not a controlled substance offense.

Our precedent does not resolve Dubois's challenge. The government relies on our decision in United States v. Bates, 960 F.3d 1278, 1293 (11th Cir. 2020), which held that "Bates's prior Georgia convictions for possession of marijuana with intent to distribute qualified as predicate [controlled substance] offenses ... [under] the Guidelines." But there was no intervening-change-of-law problem in Bates. Even though Bates was decided *after* the amendments excluding hemp from the Georgia and federal definitions of marijuana were passed, Bates was convicted of the Georgia marijuana offense and sentenced for the federal firearm offense *before* those amendments were passed. *See* Brief of Appellant at 1, 10, *United States v. Bates, 960 F.3d 1278 (11th Cir. 2020)* (No. 18-12533), 2018 WL 4858856, at *1, *10.

We must decide whether marijuana is a "controlled substance" under the guideline definition of "controlled substance offense," *see* U.S.S.G. § 4B1.2(b), and that question comprises two sub-questions that have divided our sister circuits. First, when the predicate offense is a state crime, is the meaning of "controlled substance" nonetheless limited to drugs regulated by the federal Controlled Substances Act, 21 U.S.C. § 802, or is it instead defined by the state's drug schedules? Second, is

"controlled substance" defined by reference to the relevant drug schedules in effect at the time of the defendant's prior state conviction or those in effect at the time of his federal sentencing for the instant firearm offense?

**\*1296** 1. For a Prior State Conviction, a "Controlled Substance" is a Substance Regulated by State Law.

The first sub-question is whether "controlled substance" is defined by reference to federal or state drug schedules. Most circuits that have addressed it have held that, for prior state convictions, a "controlled substance" is one regulated by state law, even if it is not also regulated by federal law. *See United States v. Lewis*, 58 F.4th 764, 768–69 (3d Cir. 2023); *United States v. Ward*, 972 F.3d 364, 372 (4th Cir. 2020); *United States v. Jones*, 81 F.4th 591, 599 (6th Cir. 2023); *United States v. Ruth*, 966 F.3d 642, 654 (7th Cir. 2020); *United States v. Henderson*, 11 F.4th 713, 718 (8th Cir. 2021); *United States v. Jones*, 15 F.4th 1288, 1291 (10th Cir. 2021). But two circuits have held that the meaning of "controlled substance" is limited to drugs regulated by the federal Controlled Substances Act, even for state-law convictions. *See United States v. Townsend*, 897 F.3d 66, 74–75 (2d Cir. 2018); *United States v. Bautista*, 989 F.3d 698, 702 (9th Cir. 2021); *see also United States v. Crocco*, 15 F.4th 20, 23 (1st Cir. 2021) (describing, in dicta, this federal-law-only approach as "appealing" and the majority approach as "fraught with peril"); *United States v. Gomez-Alvarez*, 781 F.3d 787, 793–94 (5th Cir. 2015) (adopting a federal-law-only approach to define "controlled substance" under section 2L1.2(b)(A)(i) of the Sentencing Guidelines).

We adopt the majority approach. A drug regulated by state law is a "controlled substance" for state predicate offenses, even if federal law does not regulate that drug. More precisely, *state law* defines which drugs qualify as a "controlled substance" if the prior conviction was under state law, and *federal law* defines which drugs qualify as a "controlled substance" if the prior conviction was under federal law. This approach is compelled by the text of the guidelines and our precedent.

We begin with the text. "When interpreting the guidelines, we apply the traditional rules of statutory construction." *United States v. Stines*, 34 F.4th 1315, 1318 (11th Cir. 2022) (citation and internal quotation marks omitted). And "in every statutory-interpretation case, we start with the text—and, if we find it clear, we end there as well." *Heyman v. Cooper*, 31 F.4th 1315, 1318 (11th Cir. 2022) (citation and internal quotation marks omitted). The text of the guidelines makes clear that a "controlled substance" includes a substance that is regulated only by the law of the state of conviction.

Although the guidelines do not define "controlled substance," they define "controlled substance offense" broadly to include "an offense under federal *or state* law." U.S.S.G. § 4B1.2(b) (emphasis added). As a matter of ordinary language, if state law can define what qualifies as a controlled substance offense, "it follows that it can also define what drugs are controlled substances." *Lewis*, 58 F.4th at 769.

Moreover, section 4B1.2(b) does not expressly reference the federal Controlled Substances Act in its definition of controlled substance offense. *See* U.S.S.G. § 4B1.2(b) ("an offense under federal or state law ... that ... prohibits ... the possession of a controlled substance (or a counterfeit substance) with intent to ... distribute"). This omission is notable because "the Guidelines often do cross-reference the United States Code in that way." *Lewis*, 58 F.4th at 769. Indeed, the immediately preceding provision does so when defining "crime of violence." *See* U.S.S.G. § 4B1.2(a)(2) ("any offense under federal or state law ... that ... is ... the use or unlawful possession of a firearm *described in* 26 U.S.C. [section] 5845(a)* or explosive **\*1297** material *as defined in* 18 U.S.C. [section] 841(c)*" (emphasis added)). "With this definition, the Sentencing Commission demonstrated that it knew how to" define state offenses by reference to federal law "when it meant to do so." *See Dupree*, 57 F.4th at 1278; *accord Ruth*, 966 F.3d at 651 ("The Sentencing Commission clearly knows how to cross-reference federal statutory definitions when it wants to."). But it did not do so here. We must respect the Commission's decision to "use[ ] particular language in one section but omit[ ] it in another." *Dupree*, 57 F.4th at 1278 (alterations adopted) (quoting *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391, 135 S.Ct. 913, 190 L.Ed.2d 771 (2015)). "This 'interpretive canon applies with particular force' where," as here, "the provision that includes specific language is in 'close proximity' to the provision that excludes it." *Id.*

(alterations adopted) (quoting *MacLean*, 574 U.S. at 392, 135 S.Ct. 913) (referring to section 4B1.2(b) and section 4B1.2(a) as "sister subsections").

Our precedent supports our rejection of the federal-law-only approach. We have held that a state statute need not include the same elements as a generic "federal analogue[ ]" crime to constitute a controlled substance offense because "the sentencing guidelines d[o] not define 'controlled substance offense' by reference to those analogues." *United States v. Pridgeon*, 853 F.3d 1192, 1198 (11th Cir. 2017) (citing *United States v. Smith*, 775 F.3d 1262, 1268 (11th Cir. 2014)). And the identity of "marijuana" as the substance possessed is undoubtedly an element of Dubois's statute of conviction, which criminalizes "possess[ion] with intent to distribute *marijuana*." GA. CODE § 16-13-30(j)(1) (2013) (emphasis added).

The two sister-circuit decisions adopting the federal-law-only approach do not persuade us. The Second Circuit selected that rule by relying on the presumption that "the application of a federal law does not depend on state law." *Townsend*, 897 F.3d at 71 (citing *Jerome v. United States*, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943) ("[W]e must generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law.")). But that presumption is overcome by the plain text of section 4B1.2(b), which defines "controlled substance offense" with express reference to state law. *E.g.*, *Lewis*, 58 F.4th at 769.

Nor are we swayed by the reasoning of the Ninth Circuit that our approach undermines the guidelines' "goal[ ]" of uniformity. *See Bautista*, 989 F.3d at 702; U.S.S.G. ch.1, pt. A, intro. cmt. 1.3 (explaining that one of Congress's "objectives" in enacting the Sentencing Reform Act of 1984 was to create "reasonable uniformity in sentencing"). Although we have cited the guidelines' goal of sentencing uniformity, we have cautioned that this goal cannot "alone justify" a particular interpretation of a guideline and cannot "be used to contradict the [guideline's] text." *See United States v. Bryant*, 996 F.3d 1243, 1257–58 (11th Cir. 2021) (citation and internal quotation marks omitted); *see also Est. of Keeter v. Comm'r*, 75 F.4th 1268, 1281 (11th Cir. 2023) (stating that "we are not at liberty" to "override"

plain text by recourse to "broad purposes" (citation and internal quotation marks omitted)). In any event, as another circuit has explained, "the sentencing goal of uniformity is illusory" in this context because both approaches yield some differential treatment between similarly situated defendants. *See Lewis*, 58 F.4th at 770 (explaining how "uniformity is unattainable" under any interpretation).

Because Dubois's underlying conviction was under Georgia law, we consult **\*1298** Georgia law to determine whether the substance that he trafficked is a "controlled substance" under the guidelines. We recognize that the Georgia and federal definitions of "marijuana" were the same at all relevant times: both definitions included hemp at the time of Dubois's state conviction but excluded it at the time of his federal sentencing. But we reject the parties' suggestion that we need not decide which sovereign's law controls to decide this appeal. As our following discussion illustrates, our answer to this "whose law" question informs our answer to the "what time" question that follows.

2. "Controlled Substance" is Defined by the Law
in Effect at the Time of the Prior State Conviction.

Next, we must decide whether the guideline definition of "controlled substance offense" incorporates the state drug schedules in effect when Dubois was convicted of his state drug offense or the version in effect when he was sentenced for his federal firearm offense. We presume under the categorical approach that Dubois was convicted for trafficking hemp, which the parties agree was the least culpable conduct criminalized. So if district courts must look to the time of conviction, the district court correctly concluded that Dubois's 2013 Georgia marijuana conviction is a "controlled substance offense" under the guidelines because hemp was a controlled substance under Georgia law at that time. But if district courts must instead look to the time of sentencing, hemp's delisting from the state drug schedules before sentencing means that Dubois's 2013 conviction is not a controlled substance offense and that the enhancement was improper.

Our sister circuits are split on this timing question. Three have adopted a time-of-state-conviction approach. *See Lewis*, 58 F.4th at 771; *United States v. Clark*, 46 F.4th 404, 406 (6th Cir. 2022), *cert. denied*, ––– U.S. ––––, 144 S. Ct. 107,

217 L.Ed.2d 29 (2023); *United States v. Perez*, 46 F.4th 691, 703 (8th Cir. 2022). Two others follow a time-of-federal-sentencing approach. *See United States v. Abdulaziz*, 998 F.3d 519, 524 (1st Cir. 2021); *Bautista*, 989 F.3d at 703; *see also United States v. Gibson*, 55 F.4th 153, 159, 166 (2d Cir. 2022) (concluding that a time-of-sentencing rule is "more appropriate" but declining to decide whether "the district court should consult the [Controlled Substances Act] version at the time of the defendant's current offense or the version at the time of his sentencing for this offense, since the controlled substance schedules were narrower than state law at both times"), *adhered to on reh'g*, 60 F.4th 720 (2d Cir. 2023).

We adopt a time-of-state-conviction rule: the term "controlled substance," *see* U.S.S.G. §§ 2K2.1(a)(4)(A), 4B1.2(b), means a substance regulated by state law when the defendant was convicted of the state drug offense, even if it is no longer regulated when the defendant is sentenced for the federal firearm offense. This rule follows from the text of the guidelines and Supreme Court precedent.

We begin again with the text. The guideline assigns the defendant a base offense level of 20 if he "committed any part of the instant offense subsequent to sustaining one felony conviction of ... a controlled substance offense." *Id.* § 2K2.1(a)(4)(A). The phrase "subsequent to" supports a backward-looking approach in defining the contents of the prior state conviction because that phrase "direct[s] the court's attention to events that occurred in the past." *Clark*, 46 F.4th at 409. True, the guideline defining "controlled substance offense" includes present-tense language: it refers to a felony offense "that *prohibits* ... the possession of a controlled substance ... with intent to ... distribute."

**\*1299** U.S.S.G. § 4B1.2(b) (emphasis added). But as the Supreme Court has explained in a similar context, an ordinary reader would understand that the guideline refers to a conviction that occurred in the past and that the definition provision "use[s] the present tense to refer to [that] past conviction[ ]." *See McNeill v. United States*, 563 U.S. 816, 822, 131 S.Ct. 2218, 180 L.Ed.2d 35 (2011). Defining an earlier conviction by reference to laws that did not exist at the time of that conviction would be an unusual interpretation of this ordinary language.

The Supreme Court's decision in *McNeill* supports this interpretation. *McNeill* involved "a closely related question" under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). *Clark*, 46 F.4th at 409. The Act imposes a 15-year mandatory minimum sentence for a person convicted of a federal firearm offense who "has three previous convictions" of a "serious drug offense." 18 U.S.C. § 924(e)(1). A "serious drug offense" includes "an offense under State law, involving ... possessing with intent to ... distribute[ ] a controlled substance ... for which a maximum term of imprisonment of ten years or more is prescribed by law." *Id.* § 924(e)(2)(A)(ii). McNeill argued that his prior state drug convictions were not "serious drug offenses" because the state had lowered the maximum penalty for those offenses after he was convicted. *McNeill*, 563 U.S. at 818, 131 S.Ct. 2218.

The Supreme Court unanimously held that the "plain text" of the Armed Career Criminal Act requires sentencing courts to consider the maximum penalties in place at the time of the state conviction, not those in place at the time of the federal firearms sentencing. *Id.* at 820, 131 S.Ct. 2218. The Court reasoned that the phrase "previous convictions" in the Act calls for a "backward-looking" inquiry, answerable only by "consult[ing] the law that applied at the time of that conviction." *Id.* And the Court explained that the "[u]se of the present tense in the definition of 'serious drug offense' "—which refers to a maximum penalty that "*is* prescribed by law"—"does not suggest otherwise." *Id.* (emphasis added). The "natural reading" of the text clearly "is concerned with convictions that have already occurred"; Congress "used the present tense to refer to past convictions." *Id.* at 820, 822, 131 S.Ct. 2218. It would be "absurd," the Court explained, to permit "subsequent changes in state law [to] erase an earlier conviction" under the Act. *Id.* at 822–23, 131 S.Ct. 2218. That interpretation would also yield "dramatically different federal sentences" for defendants "who violated [ section] 922(g) on the same day and who had identical criminal histories" based "solely" on the happenstance of their federal sentencing dates. *Id.* at 823, 131 S.Ct. 2218. The time-of-state-conviction approach, in contrast, promotes fair notice and uniformity by allowing "a defendant to know even before he violates

[section] 922(g) whether [the Act] would apply." *Id.* Although this interpretation of the Armed Career Criminal Act does not bind our interpretation of the guidelines, *McNeill*'s analysis "is nonetheless instructive" because the two provisions are similar. *See United States v. Patton,* 114 F.3d 174, 177 (11th Cir. 1997); *cf. United States v. Fritts,* 841 F.3d 937, 940 n.4 (11th Cir. 2016) ("Because the relevant parts of the definition of 'violent felony' under the [Armed Career Criminal Act] and 'crime of violence' under the Sentencing Guidelines are identical, this Court often considers cases interpreting the language in the Sentencing Guidelines as authority in cases interpreting the language in the [Act].").

The four reasons that led the Supreme Court in *McNeill* to adopt a time-of-state-conviction approach under the Armed Career Criminal Act apply readily to our interpretation of the Sentencing Guidelines. **\*1300** First, just as the phrase "previous convictions" in the Act requires a backward-looking approach in defining "controlled substance" under the Act, the phrase "subsequent to sustaining one felony conviction" in the guidelines requires a backward-looking approach in defining "controlled substance" under the guidelines. Second, just as the present-tense phrase "is prescribed by law" does not change that result under the Armed Career Criminal Act, the present-tense term "prohibits" does not change it under the guidelines either. Third, just as "[i]t cannot be correct that subsequent changes in state law can erase an earlier conviction" under the Act, *McNeill,* 563 U.S. at 823, 131 S.Ct. 2218, it cannot be correct that later changes in state law can erase an earlier conviction under the guidelines. Finally, because the Supreme Court declined to adopt an approach under the Act that would make its "applicability depend on the timing of the federal sentencing proceeding," *id.,* we decline to adopt such an approach under the guidelines.

The circuits that have adopted a time-of-federal-sentencing interpretation bypassed *McNeill*'s reasoning on a ground not applicable here. Those circuits all applied the federal-law-only approach for defining which drugs are controlled substances under the guidelines. *See Bautista,* 989 F.3d at 702; *Abdulaziz,* 998 F.3d at 523 & n.2 (applying the federal-law-only approach because the government forfeited, by not timely raising, the argument

that a state-law approach applied); *see also Gibson,* 55 F.4th at 164. Having selected that approach, the issue before these courts became which version of the *federal* drug schedules courts must consult to determine whether a prior drug conviction involved a "controlled substance." The question in *McNeill* was different, these courts reasoned, because it involved an intervening change in *state law,* not federal law. *Bautista,* 989 F.3d at 703 ("Unlike in *McNeill,* the state law in our case has not changed. Rather, federal law has changed."); *Gibson,* 55 F.4th at 162 ("[T]he focus [in *McNeill*] was not on federal law but only on North Carolina law."); *Abdulaziz,* 998 F.3d at 530 ("[I]n *McNeill,* the Court did not consider —because it had no occasion to consider—the issue of what temporal version of the *federal* drug schedules was relevant."). Putting aside whether that distinction warrants a departure from *McNeill*'s reasoning, the distinction is absent here. Because we hold that *state law* defines which drugs are controlled substances for state predicate offenses, the focus here, as in *McNeill,* is state law. And Dubois's arguments for applying a time-of-sentencing rule run headlong into *McNeill.*

To sum up, we hold that a "controlled substance" under section 4B1.2(b)'s definition of "controlled substance offense" is, for prior state offenses, a drug regulated by state law at the time of the conviction, even if it is not federally regulated, and even if it is no longer regulated by the state at the time of federal sentencing. Because Georgia law regulated marijuana—including hemp—at the time of Dubois's 2013 conviction, the district court did not err by enhancing Dubois's base-offense level under section 2K2.1(a)(4)(A).

### D. Our Precedent Bars Dubois's Challenge to the Stolen-Gun Enhancement.

The district court enhanced Dubois's base offense level under the guidelines after finding that one of the guns he possessed had been stolen. *See* U.S.S.G. § 2K2.1(b)(4)(A) ("If any firearm ... was stolen, increase by 2 levels."). We have held that this enhancement does not require proof that the defendant *knew* that the gun was stolen. *See United*

*States v. Richardson*, 8 F.3d 769, 770 (11th Cir. 1993) ("The provisions of [ **\*1301** section] 2K2.1(b)(4) are not ambiguous; there is clearly no mens rea requirement."); *accord United States v. Holden*, 61 F.3d 858, 860 (11th Cir. 1995). Dubois argues that the guideline's lack of a mens rea element violates his Fifth Amendment right to due process. But we rejected that argument in *Richardson*: "the lack of a mens rea element in the sentencing enhancement for possession of a stolen firearm does not offend due process because [ section] 2K2.1(b)(4) does not create a crime separate and apart from the underlying felony." 8 F.3d at 770.

Dubois acknowledges that our precedent bars his challenge, but he asks us to "revisit" and "overturn" it in the light of *Kisor v. Wilkie*, — U.S. —, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019). *Kisor* holds that courts may not give controlling deference to an agency's interpretation of its own regulation unless the regulation is "genuinely ambiguous." *Id.* at 2414. And we have extended this rule to commentary interpreting the Sentencing Guidelines. *Dupree*, 57 F.4th at 1276. The commentary to the stolen-gun guideline states that the enhancement applies "regardless of whether the defendant knew or had reason to believe that the firearm was stolen." U.S.S.G. § 2K2.1 n.8(B). Dubois argues that deference to this commentary violates *Kisor* because the commentary "impermissibly expands the application of the guideline" beyond its plain meaning.

Dubois attacks a strawman. *Richardson* did not mention the commentary to the stolen-gun enhancement—the decision rested only on the guideline's text, which this Court held was "not ambiguous" and "clearly" imposed "no mens rea requirement." 8 F.3d at 770. It is true that our later decision in *Holden* cites both *Richardson* and the challenged commentary when reiterating that "knowledge that [the gun] is stolen property is not a prerequisite to the application of [ section] 2K2.1(b)(4)." *Holden*, 61 F.3d at 860. But the *Holden* Court did not purport to give the commentary "controlling weight," so that decision does not implicate *Kisor*'s limitations on *Auer* deference. *See Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021). Even if it had, to the extent that *Holden*'s reasoning departs from

*Richardson*'s, *Richardson*'s controls. *See MacPhee v. MiMedx Grp.*, 73 F.4th 1220, 1250 (11th Cir. 2023) (under the "earliest case" rule, when prior panel precedents conflict, the earlier case controls (citation and internal quotation marks omitted)); *Thompson v. Alabama*, 65 F.4th 1288, 1301 (11th Cir. 2023) (a later panel is bound by "the reasoning" of "the first panel's ruling" (citation and internal quotation marks omitted)). We affirm the application of the stolen-gun enhancement.

### E. The District Court did Not Plainly Err by Imposing a Fine.

Dubois's final challenge is to the district court's imposition of a low-end $25,000 fine. He argues that he is unable to pay the fine and that the district court was required to, but did not, provide reasons for imposing it. We reject his challenge and affirm the fine.

The guidelines require the district court to impose a fine in every case, unless "the defendant establishes" that he is presently unable to pay a fine and will not likely become able to pay one in the future. U.S.S.G. § 5E1.2(a). If the defendant fails to prove present and future inability to pay, the district court must impose a fine, *see id.*, and will consider eight factors to determine the appropriate amount, *see id.* § 5E1.2(d). But if "the defendant did not object to the fine at sentencing," the sentencing court is "not require[d] ... to make specific findings of fact with respect to the Sentencing Guideline factors"; we will affirm if "the record support[s] the **\*1302** fine." *See United States v. Gonzalez*, 541 F.3d 1250, 1256 (11th Cir. 2008) (citation and internal quotation marks omitted); *Hernandez*, 160 F.3d at 665–66 (affirming fine, despite presentence investigation report finding that "the defendant does not have the ability to pay a fine," because the defendant did not object to the fine at sentencing and "the record suggest[ed] that [he] may be able to pay" it).

Although we ordinarily review for clear error a finding that a defendant can afford a fine, *see United States v. McGuinness*, 451 F.3d 1302, 1307 (11th Cir. 2006), we review only for plain error if the defendant fails to object on the basis of his inability to pay the fine, *see Hernandez*, 160 F.3d at 665. To preserve clear-error review, an objection must be specific enough to "adequately apprise[ ] the trial court

of the true basis for [the] objection." *United States v. Williford*, 764 F.2d 1493, 1502 (11th Cir. 1985) (citation and internal quotation marks omitted). So "a general objection or an objection on other grounds will not suffice." *United States v. Gallo-Chamorro*, 48 F.3d 502, 507 (11th Cir. 1995).

Nor will "vague reference[s] to [the] concern." *Williford*, 764 F.2d at 1502. The defendant also must "specifically and clearly object" to any disputed facts listed in the presentence investigation report; otherwise, those facts are deemed admitted, and the district court is entitled to rely on them at sentencing. *United States v. Corbett*, 921 F.3d 1032, 1043 (11th Cir. 2019) (citation and internal quotation marks omitted).

Dubois failed to object on the basis of his inability to pay the fine in response to the presentence investigation report or during his sentencing hearing, so we review his objection for plain error. In his objections to the report, Dubois did not challenge the probation officer's assertion that he could afford a fine of up to $250,000. Nor did he challenge any of the findings about his assets, liabilities, income, or ability to work for pay while incarcerated. And during the sentencing hearing, defense counsel made only a vague, general objection—challenging both the fine and sentence as "substantively unreasonable." "This abstract and general objection did not inform the district court of [Dubois]'s specific objections to [the fine], and [Dubois] thereby deprived the court of the opportunity to consider (and if necessary correct) them." *See United States v. Carpenter*, 803 F.3d 1224, 1238 (11th Cir. 2015). Dubois's counsel never argued that Dubois could not afford to pay the fine or otherwise asked the district court for " 'further findings with respect to the fine.' " *Gonzalez*, 541 F.3d at 1256 (quoting *Hernandez*, 160 F.3d at 666). These challenges, which Dubois raises for the first time on appeal, are not challenges to the substantive reasonableness of the fine. *See United States v. Bradley*, 644 F.3d 1213, 1304 (11th Cir. 2011) (explaining that the defendant's inability to pay a fine does not make it "substantively unreasonable"); *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (explaining that challenging the district court's "fail[ure] to adequately explain the chosen sentence" challenges the sentence's *procedural* reasonableness, not its *substantive* reasonableness).

The district court did not plainly err by imposing a $25,000 fine without explanation because the record contains unchallenged evidence of Dubois's ability to pay it. *See Hernandez*, 160 F.3d at 665–66. Even on appeal, Dubois does not dispute the probation officer's findings that Dubois had a total net worth of over $54,000 (more than double the fine amount), that he had an additional monthly income of over $3,000, or that he was "able-bodied and could work while in custody to make minimal payments towards **\*1303** any fine." Nor does he dispute that he failed to respond to the probation officer's request for financial information, which we have said may support the inference that the defendant is concealing additional assets. *See, e.g.*, *id.* at 666 (stating that a defendant's "unwillingness to answer specific questions concerning his financial dealings put to him by the probation officer who prepared the [presentence investigation report] may permit the inference that he is still concealing assets"). The district court was permitted to rely on this undisputed record evidence to find that Dubois could pay a $25,000 fine.

## IV. CONCLUSION

We **AFFIRM** Dubois's convictions and sentence.

*Rosenbaum*, Circuit Judge, joined by *Abudu*, Circuit Judge, Concurring:

I concur in today's decision, including the conclusion that we must look to state law at the time of the prior conviction to determine whether, under U.S.S.G. § 2K2.1(a)(4)(A), the defendant has a prior conviction that qualifies him for a sentencing enhancement. I reach this conclusion because the combination of the text of U.S.S.G. § 2K2.1(a)(4)(A) and the Supreme Court's reasoning in *McNeill v. United States*, 563 U.S. 816, 131 S.Ct. 2218, 180 L.Ed.2d 35 (2011), compel it.

That said, I write separately for two reasons. First, I explain that today's approach is correct regardless of the Supreme Court's forthcoming decisions in *Jackson v. United States*, No. 22-6640, and *Brown v. United States*, No. 22-6389. Second, I identify two policy reasons in favor of revising the Sentencing Guidelines to take a time-of-sentencing approach.

*A. No matter how the Court rules,*
Jackson *and* Brown *are distinguishable.*

I begin with a brief discussion of *Jackson* and *Brown*. I then explain that, however the Court rules, those decisions are unlikely to alter our conclusion that Dubois's state conviction is a "controlled substance offense" under the Sentencing Guidelines.

Both *Jackson* and *Brown* concerned the definition of "serious drug offense" in the Armed Career Criminal Act ("ACCA"), 🚩 18 U.S.C. § 924(e). Under that definition, a prior state offense qualifies as a "serious drug offense" if it is

> an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (*as defined in section 102 of the Controlled Substances Act (* 📙 21 U.S.C. § 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law.

📙 18 U.S.C. § 924(e)(2)(A)(ii) (emphasis added).

Jackson challenged his ACCA enhancement, asserting that his prior cocaine-related state convictions did not qualify as "serious drug offenses." *United States v. Jackson*, 55 F.4th 846, 850 (11th Cir. 2022), *cert. granted*, ––– U.S. ––––, 143 S. Ct. 2457, 216 L.Ed.2d 430 (2023). Jackson argued that his prior cocaine-related state conviction was categorically overbroad because the state's definition of "cocaine" was broader than the federal definition at the time of his federal firearm offense. 📙 *Id.* at 851. We rejected this argument, holding that the definition of "serious drug offense" incorporates the version of the federal Controlled Substances Act ("CSA") in effect at the time of the defendant's prior state drug conviction, not the version in effect at the time of the later federal firearm **\*1304** offense or sentencing. 📙 *Id.* at 849. Like today's decision, we relied heavily on 🔶 *McNeill* and its proclamation that ACCA requires a ' "backward-looking' inquiry" so as not to "erase an earlier [state] conviction for ACCA purposes." 📙 *Id.* at 855–56 (alteration in original) (quoting 📙 🔶 *McNeill*, 563 U.S. at 820, 823, 131 S.Ct. 2218).

Similarly, Brown challenged his ACCA enhancement based on a prior state marijuana conviction. 📙 *United States v. Brown*, 47 F.4th 147, 148 (3d Cir. 2022), *cert. granted*, ––– U.S. ––––, 143 S. Ct. 2458, 216 L.Ed.2d 430 (2023). He asserted that his prior state offense no longer qualified as a "serious drug offense" after Congress amended the federal CSA to remove hemp from the definition of "marijuana." 📙 *Id.* The Third Circuit applied the federal CSA in effect when Brown committed his federal offense, not at the time of his prior state conviction or at the time of federal sentencing. 📙 *Id.* at 155.

The Supreme Court granted certiorari to resolve this timing question—whether a sentencing court applies the federal CSA at the time of the prior state conviction, federal firearm offense, or federal sentencing when imposing an ACCA enhancement.

Unlike 📙 *Jackson* and 📙 *Brown*, Dubois's case arises under the Sentencing Guidelines, not under ACCA. And that makes all the difference, if the Supreme Court concludes in 📙 *Jackson* and 📙 *Brown* that ACCA's definition of "serious drug offense" requires courts to consider the federal controlled-substances lists applicable at the time of the federal firearm offense (or sentencing) rather than at the time of the prior state offense.

ACCA defines the term "controlled substance" with express reference to the federal CSA. *See* 🚩 18 U.S.C. 924(e)(2)(A)(ii) (defining "serious drug offense" as "an offense under State law, involving ... a controlled substance (*as defined in section 102 of the Controlled Substances Act (* 📙 *21 U.S.C. 802)*" (emphasis added). During the 📙 *Jackson* and 📙 *Brown* oral arguments, the Supreme Court homed in on this part of the definition of "serious drug offense." In particular, the Justices posited that, by referencing the CSA by name, Congress may have intended for ACCA's definition of "serious drug offense" to incorporate only those substances appearing on the federal controlled-substances lists at the time of the federal firearms offense (or federal sentencing). *See* Transcript of Oral Argument at 57, *Jackson*, No. 22-6640 (U.S. argued Nov. 27, 2023) (Gorsuch, J.) ("[N]ormally when we have a cross-reference, we look at the contemporaneous version of the cross-reference."); *id.* at 56 (Sotomayor, J.) ("[W]hen you're cross-referencing something, you're taking

everything with it".); *id.* at 69 (Jackson, J.) ("Do you concede that a change in the drug schedules reflects a change in what is considered to be a serious drug offense?"); *id.* at 86 (Thomas, J.) (a change to the federal CSA "seems to be in effect an amendment of ACCA"); *id.* at 74–75 (Kagan, J.) (similar).

In other words, by expressly referencing the CSA and incorporating its definition of "controlled substance" into ACCA, Congress intended that ACCA would effectively be amended every time that Congress amended the CSA (or the Attorney General updated the CSA lists [1] ). So to trigger an ACCA enhancement, a defendant's prior **\*1305** state drug conviction would have to involve a substance on the federal controlled-substances lists at the time of the federal firearm offense (or federal sentencing). And if it did not, that prior state conviction could not qualify under ACCA as a "serious drug offense."

But the text of ACCA's definition of "serious drug offense" and the Guidelines' definition of "controlled substance offense" differ in three important ways that make any such holding in 🚩 *Jackson* and 🚩 *Brown* inapplicable to the Sentencing Guidelines context.

First, unlike ACCA, 🚩 section 4B1.2(b) does not cross-reference the federal CSA (or any other specific law, for that matter) or otherwise define "controlled substance." *Compare* 🚩 18 U.S.C. § 924(e)(2)(A)(ii) *with* 🚩 U.S.S.G. § 4B1.2(b). Rather, the guideline refers generally to only "an offense *under federal or state law* ... that [involves] ... *a controlled substance* ...." 🚩 U.S.S.G. § 4B1.2(b) (emphasis added). This differs from ACCA, which directs that a "controlled substance" is what the federal CSA says it is, no matter how state law defines it. Under the guideline, though, for the reasons Chief Judge Pryor explains in the panel opinion, we must look to state law to discern the meaning of "controlled substance" with respect to a state conviction.

Because the guideline lacks a cross-reference to another specified law, it does not provide the same basis that ACCA's text may for us to adopt the meaning of "controlled substance" at the time of the federal firearm offense (or federal sentencing).

Second, while Congress can amend the federal CSA (and thus effectively ACCA) at any time, it cannot amend state drug schedules. Nor can the federal Sentencing Commission.

So Congress's amendment of the federal CSA or any other federal law [2] doesn't allow us to conclude that a newer version of state controlled-substances lists govern.

Nor can states amend the federal Sentencing Guidelines. So it makes little sense to condition application of the federal Guidelines on changes in state law if the text of the guideline in question does not otherwise require it.

Third, because the Guidelines lack any statutory cross-reference—and that is the only material difference between ACCA's definition of "serious drug offense" the Guidelines' definition of "controlled substance offense"—nothing allows us to persuasively distinguish 🚩⚠ *McNeill.* 🚩⚠ *McNeill* requires us to look to the state's penalty for the prior state offense at the time of the prior state conviction, not at the time of the federal firearm offense (or federal sentencing), if the state has amended that penalty. 🚩 563 U.S. at 825, 131 S.Ct. 2218. That's so because the term "previous convictions" in ACCA directs a "backward-looking" inquiry, and "subsequent changes in state law [do not] erase an earlier conviction." 🚩 *Id.* at 820, 823, 131 S.Ct. 2218.

In the same way, 🚩 section 2K2.1(a)(4) requires a backward-looking inquiry by directing courts to consider whether "the defendant committed any part of the [federal firearm] offense *subsequent to sustaining*" a felony "controlled substance" conviction. 🚩 U.S.S.G. § 2K2.1(a)(4) (emphasis added). The guideline's plain text aligns it with 🚩⚠ *McNeill* and distinguishes it from 🚩 *Jackson*, however the Supreme Court rules.

Indeed, if the Supreme Court upholds our ruling in 🚩 *Jackson*, then as in that case, 🚩⚠ *McNeill* drives the answer here. The only **\*1306** material difference between 🚩 *Jackson* and Dubois's fact patterns is that Jackson's sentence was enhanced under ACCA, and Dubois's was enhanced under the Sentencing Guidelines. So if 🚩⚠ *McNeill*'s reasoning controls 🚩 *Jackson*—even considering ACCA's statutory cross-reference—it must likewise dictate the outcome here, where there is no cross-reference.

But if the Supreme Court reverses *Jackson*—holding that ACCA's express reference to the CSA requires us to consult the CSA as it existed at the time of the federal offense (or federal sentencing)—that reasoning doesn't translate to the Guidelines context because the Guidelines lack an express cross-reference to another statute. So whatever the Supreme Court may decide about ACCA's unique text and the question of which version of the *federal* CSA governs under it, that decision does not bear on the distinct question of which version of the state's controlled-substances lists governs in the Guidelines context. *See Jackson*, 55 F.4th at 856 n.7 (quoting *Brown*, 47 F.4th at 154) ("longstanding principles of statutory interpretation allow different results under the Guidelines as opposed to under the ACCA").

In short, *McNeill* and the text of the Guidelines require us to conclude that Dubois's state marijuana conviction remains a "controlled substance offense" under the Sentencing Guidelines even if it would not qualify as a "serious drug offense" under ACCA. So I concur in today's judgment.

*B. The Sentencing Commission should consider revising the guidelines to take a time-of-sentencing approach.*

As I've explained, I believe that our holding today is legally compelled. But at least two policy reasons suggest that the Sentencing Commission may wish to revisit the guidelines' definition of "controlled substance offense."

First, as the First Circuit has pointed out, "[a] guideline's enhancement for a defendant's past criminal conduct—such as the enhancement that [U.S.S.G.] § 2K2.1(a)(4)(A) imposes—is reasonably understood to be based in no small part on a judgment about how problematic that past conduct is when viewed as of the time of the sentencing itself." *United States v. Abdulaziz*, 998 F.3d 519, 528 (1st Cir. 2021). So when the state that criminalized the conduct underlying the defendant's prior conviction determines that conduct no longer warrants treatment as a criminal offense, that is evidence that the state no longer views the underlying conduct as problematic.[3] As a result, it undercuts the basis

for enhancing the defendant's sentence based on his prior conviction for that conduct.

Second, whether or not section 2K2.1(a)(4)(A)'s enhancement applies, the criminal-history axis already captures the prior sentence. *See id.* (citing U.S.S.G. § 4A1.1(a)–(c); ch. 5, pt. A). The criminal-history axis was designed specifically, at least in part, to send "a clear message ... to society that repeated criminal behavior will aggravate the need for punishment with each recurrence." U.S. Sent'g Guidelines Manual ch. 4, pt. A, introductory cmt. (U.S. Sent'g Comm'n 2018). In other words, the criminal-history axis considers that a defendant has more than once participated in conduct criminal at the time that the defendant engaged in it.

Besides that, even without the guideline's enhancement, the sentencing judge retains the discretion to account further **\*1307** for the defendant's criminal history at sentencing. *See Abdulaziz*, 998 F.3d at 528. But as section 2K2.1(a)(4)(A) stands, it tethers the guidelines calculation—the starting place for all sentences—to a state's legislative judgment of the past, even if the state legislature has since retracted that judgment. So it can result in a defendant serving a longer prison sentence based only on conduct that is no longer a crime. A defendant's liberty should not depend on a "quirk of timing." *Abdulaziz*, 998 F.3d at 529.

In my view, these circumstances provide good reason for the Sentencing Commission to consider expressly whether section 2K2.1(a)(4)(A) should apply to prior convictions that would not qualify as predicate crimes under the law as it exists at the time of sentencing. And if the Supreme Court takes a time-of-sentencing approach in *Brown* and *Jackson*, the Sentencing Commission may especially want to do so for the sake of consistency. But, again, regardless of those potential developments, Dubois's state marijuana conviction remains a "controlled substance offense" under the sentencing guidelines, and the district court's sentencing enhancement was proper.

**All Citations**

94 F.4th 1284

## Footnotes

1   The Controlled Substances Act authorizes the Attorney General to "remove any drug or other substance from the schedules if he finds that the drug or other substance does not meet the requirements for inclusion in any schedule." 21 U.S.C. § 811(a); *see also id.* § 812 n.1 ("Revised schedules are published in the Code of Federal Regulations, Part 1308 of Title 21, Food and Drugs.").

2   Of course, Congress could adopt alterations to U.S.S.G. § 4B1.2(b) or § 2K2.1(a)(4)(A) itself that expressly incorporate any state updates to their controlled-substances lists. But that did not happen here.

3   For instance, as of last year, twenty-three states have legalized small amounts of marijuana for recreational use, and others have acted to reduce or eliminate penalties for drug use and possession. *See* Michael Hartman, *Cannabis Overview*, Nat'l Conf. of State Legislatures (Nov. 8, 2023), https://perma.cc/S2PM-52Q8.

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.